09 CV 1392

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, Individually and On Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>  v.<br><br>MERRILL LYNCH & CO. INC., MERRILL LYNCH MORTGAGE LENDING, INC., MERRILL LYNCH MORTGAGE INVESTORS, INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, FIRST FRANKLIN FINANCIAL CORPORATION, CREDIT-BASED ASSET SERVICING AND SECURITIZATION LLC, J.P. MORGAN SECURITIES, INC., ABN AMRO INCORPORATED, MCGRAW-HILL COMPANIES, MOODY'S INVESTORS SERVICE, INC., MATTHEW WHALEN, PAUL PARK, BRIAN T. SULLIVAN, MICHAEL M. MCGOVERN, DONALD J. PUGLISI, FIRST FRANKLIN MORTGAGE LOAN TRUST, SERIES 2007-FFC, MERRILL LYNCH ALTERNATIVE NOTE ASSET TRUST, SERIES 2007-A2, MERRILL LYNCH ALTERNATIVE NOTE ASSET TRUST, SERIES 2007-A3, MERRILL LYNCH ALTERNATIVE NOTE ASSET TRUST, SERIES 2007-AF1, MERRILL LYNCH ALTERNATIVE NOTE ASSET TRUST, SERIES 2007-OAR2, MERRILL LYNCH ALTERNATIVE NOTE ASSET TRUST, SERIES 2007-OAR3, MERRILL LYNCH ALTERNATIVE NOTE ASSET TRUST, SERIES 2007-OAR4, MERRILL LYNCH ALTERNATIVE NOTE ASSET TRUST, SERIES 2007-OAR5, MERRILL LYNCH FIRST FRANKLIN MORTGAGE LOAN TRUST, SERIES 2007-1, MERRILL LYNCH FIRST FRANKLIN MORTGAGE LOAN TRUST, SERIES 2007-2, MERRILL LYNCH FIRST FRANKLIN MORTGAGE LOAN TRUST, SERIES 2007-3, MERRILL LYNCH FIRST FRANKLIN MORTGAGE LOAN TRUST, SERIES 2007-4,<br><br> (Caption Continued On Next Page) | Civil Action No.<br><br><br>CLASS ACTION COMPLAINT FOR VIOLATION OF §§ 11, 12(a)(2) AND 15 OF THE SECURITIES ACT OF 1933<br><br>DEMAND FOR JURY TRIAL<br><br> |

MERRILL LYNCH FIRST FRANKLIN
MORTGAGE LOAN TRUST, SERIES 2007-
5, MERRILL LYNCH FIRST FRANKLIN
MORTGAGE LOAN TRUST, SERIES 2007-
A, MERRILL LYNCH FIRST FRANKLIN
MORTGAGE LOAN TRUST, SERIES 2007-
H1, MERRILL LYNCH MORTGAGE
BACKED SECURITIES TRUST, SERIES
2007-2, MERRILL LYNCH MORTGAGE
BACKED SECURITIES TRUST, SERIES
2007-3, MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2007-HE2,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2007-HE3,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2007-MLN1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2007-SD1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2007-SL1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES MLCC 2007-
2, MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES MLCC 2007-
3, SPECIALTY UNDERWRITING AND
RESIDENTIAL FINANCE TRUST, SERIES
2007-BC2, 2006-CB8 TRUST, 2006-CB4
TRUST, FIRST FRANKLIN MORTGAGE
LOAN TRUST, SERIES 2006-FF18, FIRST
FRANKLIN MORTGAGE LOAN TRUST,
SERIES 2007-FF1, FIRST FRANKLIN
MORTGAGE LOAN TRUST, SERIES 2007-
FF2, FIRST FRANKLIN MORTGAGE
LOAN TRUST, SERIES 2007-FFA,
MERRILL LYNCH ALTERNATIVE NOTE
ASSET TRUST SERIES 2007-A1,
MERRILL LYNCH ALTERNATIVE NOTE
ASSET TRUST, SERIES 2007-F1,
MERRILL LYNCH ALTERNATIVE NOTE
ASSET TRUST, SERIES 2007-OAR1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-A2,
MERRILL LYNCH MORTGAGE BACKED
SECURITIES TRUST, SERIES 2007-1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-SD1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST SERIES 2006-A3,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST SERIES 2006-A4,

(Caption Continued On Next Page)

MERRILL LYNCH MORTGAGE
INVESTORS TRUST SERIES 2006-AF1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-HE5,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-MLN1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-OPT1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-RM4,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-SD1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST SERIES MLCC 2006-
3, MERRILL LYNCH MORTGAGE
INVESTORS TRUST SERIES MLCC 2007-
1, MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-FM1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST SERIES 2006-AF2,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-F1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-FF1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-HE6,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-RM2,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-RM5,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-SL2,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2007-HE1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST SERIES MLCC 2006-
2, OWNIT MORTGAGE LOAN TRUST,
SERIES 2006-4, OWNIT MORTGAGE
LOAN TRUST, SERIES 2006-5,
SPECIALTY UNDERWRITING AND
RESIDENTIAL FINANCE TRUST, SERIES
2006-AB2, MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-AHL1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-AR1,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-HE2,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-HE3,
MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-HE4,

(Caption Continued On Next Page)

MERRILL LYNCH MORTGAGE
INVESTORS TRUST, SERIES 2006-RM3,
OWNIT MORTGAGE LOAN TRUST,
SERIES 2006-7, OWNIT MORTGAGE
LOAN TRUST, SERIES 2006-3, OWNIT
MORTGAGE LOAN TRUST, SERIES 2006-
6, SPECIALTY UNDERWRITING AND
RESIDENTIAL FINANCE TRUST, SERIES
2006-AB3, SPECIALTY UNDERWRITING
AND RESIDENTIAL FINANCE TRUST,
SERIES 2006-BC4, SPECIALTY
UNDERWRITING AND RESIDENTIAL
FINANCE TRUST, SERIES 2006-BC3,
SPECIALTY UNDERWRITING AND
RESIDENTIAL FINANCE TRUST, SERIES
2006-BC5, SPECIALTY UNDERWRITING
AND RESIDENTIAL FINANCE TRUST,
SERIES 2007-AB1, SPECIALTY
UNDERWRITING AND RESIDENTIAL
FINANCE TRUST, SERIES 2007-BC1,

                    Defendants.

## TABLE OF CONTENTS

Page

I.      SUMMARY OF THE ACTION ..................................................................1

II.     JURISDICTION AND VENUE ................................................................5

III.    THE PARTIES............................................................................................6

        A.      Plaintiff ..........................................................................................6

        B.      Defendants ......................................................................................6

IV.     FACTUAL BACKGROUND ..................................................................14

        A.      The Development Of The Secondary Mortgage
                Market And Subprime Mortgages ...............................................14

        B.      The Mechanics Of Structuring Asset-Backed Pass-
                Through Certificates .....................................................................17

        C.      Assessing The Quality Of A Mortgage Pass-
                Through Certificate Investment ....................................................19

        D.      The Role Of The Ratings Agencies In Structuring
                And Rating Certificates.................................................................21

V.      CERTIFICATES OFFERED BY DEFENDANTS ..................................21

VI.     DEFENDANTS MISREPRESENTED THE NATURE OF
        THE LOANS UNDERLYING THE CERTIFICATES............................24

        A.      Representations Regarding Loan Origination
                Underwriting .................................................................................24

        B.      Representations Regarding Appraisals ..........................................26

        C.      Representations Regarding Credit Enhancement...........................28

        D.      Defendants' Representations Failed To Disclose
                The True Risk Of Investing In The Certificates ..........................29

                1.      The Deterioration Of Underwriting
                        Standards.............................................................................29

                2.      The Investment-Grade Ratings
                        Misrepresented The True Risk Of The
                        Certificates .........................................................................32

VII.    MATERIAL MISSTATEMENTS AND OMISSIONS IN
        THE OFFERING DOCUMENTS ...........................................................33

i

VIII.    CLASS ACTION ALLEGATIONS ................................................................................54

FIRST CAUSE OF ACTION  For Violation of Section 11 of the
        Securities Act (Against The Individual Defendants, Issuing
        Defendants and Underwriter Defendants) ........................................................................55

SECOND CAUSE OF ACTION  For Violation of Section 12(a)(2)
        of the Securities Act (Against the Issuing Defendants and
        Underwriter Defendants) ........................................................................................................58

THIRD CAUSE OF ACTION  For Violation of Section 15 of the
        Securities Act (Against Merrill Lynch, MLML, First
        Franklin and MLPFS) ............................................................................................................59

RELIEF REQUESTED ............................................................................................................60

I.      SUMMARY OF THE ACTION

1.      Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi PERS" or "Plaintiff") brings this securities class action on behalf of itself and all persons or entities ("plaintiffs" or the "Class") who purchased or otherwise acquired beneficial interests in the assets of the Merrill Lynch Issuing Trusts (defined, *infra*) pursuant or traceable to Merrill Lynch Mortgage Investors, Inc.'s ("MLMI") February 2, 2007 Registration Statement (as amended) or Merrill Lynch Mortgage Investors, Inc.'s December 21, 2005 Registration Statement (as amended) and accompanying prospectuses and prospectus supplements. By this action, Mississippi PERS seeks redress pursuant to the Securities Act of 1933 (the "Securities Act") against defendants Merrill Lynch & Co., Inc. ("Merrill Lynch"), MLMI, Merrill Lynch Mortgage Lending, Inc. ("MLML"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"), First Franklin Financial Corporation ("First Franklin" or "First Franklin Financial"), McGraw-Hill Companies, Moody's Investor Service, Inc. ("Moody's"), Paul Park, Brian T. Sullivan, Michael M. McGovern, Donald J. Puglisi, and the Issuing Trusts.[1]

2.      This action arises from defendants' sale of asset-backed pass-through certificates (or, as commonly referred, mortgage pass-through certificates) using false and misleading offering documents. Asset-backed pass-through certificates are securities entitling the holder to income payments from pools of loans and/or asset-backed or mortgage-backed securities ("ABS" or "MBS," respectively). Fundamentally, the value for pass-through certificates depends on the ability of borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral in the event of default. In this regard, rating agencies played an important role in the sale of such securities to investors. Credit rating agencies were supposed to evaluate and report on the risk associated with investment alternatives. Based on the rating agencies' purported analysis of the loan pools, the certificates received high ratings, including "triple-A," categorizing them as investment-grade securities. As alleged below,

---

[1] The Issuing Trusts are set forth in ¶¶24-25, *infra*.

however, defendants misrepresented the quality of the loans in the loan pools and gave unjustifiably high ratings to the certificates.

3.     On December 21, 2005, MLMI filed with the SEC on Form S-3 a Registration Statement under the Securities Act of 1933, as amended on February 24, 2006, March 21, 2006 and March 28, 2006 (the "December Registration Statement"), with which MLMI indicated its intention to sell 35 billion mortgage pass-through certificates ("Certificates") through a yet-to-be-determined number of Issuing Trusts.   The Certificates would be issued pursuant to the Registration Statement and accompanying prospectuses, also filed with the SEC (the "Prospectuses"), generally explaining the structure of the Issuing Trusts and providing an overview of the Certificates.

4.     On February 2, 2007, MLMI filed with the Securities and Exchange Commission ("SEC") on Form S-3 a Registration Statement under the Securities Act of 1933, as amended (the "March Registration Statement"), with which MLMI indicated its intention to sell 85 billion mortgage pass-through certificates ("Certificates") through a yet-to-be-determined number of individual entities created solely to issue the Certificates (the "Issuing Trusts").[2]  The Certificates would be issued pursuant to the Registration Statement and two accompanying prospectuses, also filed with the SEC on March 22, 2007 and May 15, 2007 (the "Prospectuses"), generally explaining the structure of the Issuing Trusts and providing an overview of the Certificates.  The Certificates were then sold to investors by the Underwriter Defendants, as defined herein, pursuant to a series of prospectus supplements, which were also filed with the SEC and incorporated by reference into the Registration Statements ("Prospectus Supplements").  Each "Prospectus Supplement" included a detailed description of that Issuing Trust and its respective Certificates.  The Registration Statements, Prospectuses and each of the respective Prospectus Supplements are collectively referred to herein as the "Offering Documents."

_____

[2] The December Registration Statement and the March Registration Statement are collectively referred to herein as the "Registration Statements."

5.     As set forth below, the Offering Documents contained materially false and misleading statements and omitted material information in violation of Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o.  Defendants are strictly liable for those misstatements under the Securities Act.

6.     Merrill Lynch is a Wall Street investment bank that, through its various subsidiaries, provides financial products and wealth management services worldwide.  MLML, First Franklin (an operating subsidiary of a Merrill Lynch entity) and Credit-Based Asset Servicing And Securitization LLC ("C-BASS") originate and/or purchase residential mortgage loans through bulk purchases for securitization or resale.  Many of the mortgage loans originated or purchased by MLML, First Franklin and C-BASS were pooled together by MLMI and deposited into qualifying special purpose entities – the Issuing Trusts.  These pools of loans were then securitized into asset-backed securities and sold by the Issuing Trusts and Underwriter Defendants to investors in the form of the Certificates.  The Certificates were packaged in "tranches" by different levels of risk and reward.  The Certificates entitle investors to receive monthly distributions of interest and principal on cash flows from the mortgages held by the Issuing Trusts.  As the original borrowers on each of the loans pay their mortgages, distributions are made to investors in accordance with the terms of the Certificates.  If borrowers fail to pay back their mortgages, default, or are foreclosed, the losses flow to investors based on the seniority of their Certificates.

7.     Thus, the investment quality of the Certificates was and is necessarily linked to the quality of the mortgage loan pools held by each Issuing Trust.  The Offering Documents included several representations regarding: (i) the underwriting standards used by the loan originators, including First Franklin; (ii) the standards and guidelines used by First Franklin, C-BASS and/or MLML when evaluating and acquiring the loans; (iii) the appraisal standards used to value the properties collateralizing the loans, and the corresponding loan-to-value ratios of the loans; (iv) the credit enhancement supporting the loan securitization process; and (v) the

3

pre-established ratings assigned to each tranche of Certificates issued pursuant to the Offering Documents.

8.      This action relates to Certificates that separate Issuing Trusts (as set forth in ¶¶24-25, herein) issued and that Plaintiff and other Class members purchased.  While all of the Certificates were offered pursuant to the Registration Statements and Prospectuses, each Issuing Trust issued its own Prospectus Supplement offering Certificates related only to its unique loan pool.  Plaintiff Mississippi PERS purchased Series 2007-A Asset-Backed Certificates pursuant to the Prospectus Supplement filed by defendant Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A ("MLFFML Trust Series 2007-A") and Series 2007-F1 Asset-Backed Certificates pursuant to the Prospectus Supplement filed by defendant Merrill Lynch Alternative Note Asset Trust, Series 2007-F1 ("ML Alt. Note Asset Trust Series 2007-F1").  In accordance with the Prospectuses, each of the Prospectus Supplements is identical, or nearly identical, in substance.

9.      The Certificates issued by each Issuing Trust were divided into several classes, or "tranches," which had different priorities of seniority, payment, exposure to risk and default, and interest payments.  Defendants Moody's, a division of Moody's Corp., and McGraw-Hill Companies, through its division, Standard & Poor's ("S&P"), directly and indirectly participated in, and took steps necessary for the distribution of the Certificates.  In addition, Moody's and S&P directly participated in the selection of the underlying mortgages to be securitized and issued by each Issuing Trust.  Moreover, as a condition to the issuance of the Certificates, Moody's and S&P rated the investment quality of the Certificates with pre-determined ratings.  These ratings, which were expressly included in each of the Prospectus Supplements determined, in part, the price at which these Certificates were offered to Plaintiff and the Class.  Moody's and S&P assigned investment-grade ratings on most of the tranches of the offered Certificates.

10.      The highest investment rating used by Moody's is "Aaa."  The highest rating used by S&P is "AAA."  These ratings signify the highest investment-grade, and are considered

to be of the "best quality," and carry the smallest degree of investment risk. Ratings of "AA," "A," and "BBB" represent high credit quality, upper-medium credit quality and medium credit quality, respectively. These ratings are considered "investment-grade ratings." Any instrument rated lower than BBB is considered below investment-grade, or "junk bond."

11.      As alleged more fully below, the Offering Documents misstated and omitted material information regarding the quality of the loans underlying the Certificates and the process by which MLML and/or First Franklin acquired those loans. Specifically, the Offering Documents failed to disclose, *inter alia*, that the loan originators, including but not limited to First Franklin, had systematically ignored, or abandoned their stated and pre-established underwriting and appraisal standards and that MLML and First Franklin ignored their loan purchasing guidelines. Likewise, the underlying mortgages were based on collateral appraisals that overstated the value of the underlying properties.

12.      As a result of the materially false and misleading statements in the Offering Documents, Plaintiff and the Class purchased Certificates that were far riskier than represented and that were not of the "best quality," or even "medium credit quality." Consequently, certain Certificate tranches represented to be investment-grade instruments were later revealed to be below investment-grade instruments, or "junk bonds." The downgrades in the ratings caused the value of the Certificates to collapse. The Certificates continue to lose value as delinquencies, defaults and foreclosures related to the mortgages underlying the Certificates continue to increase. As a result, Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

13.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v and 28 U.S.C. § 1331.

14.     Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) and (c).  Many of the acts and conduct complained of herein occurred in substantial part in this District.

15.     In connection with the acts and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

III.     THE PARTIES

A.     Plaintiff

16.     Plaintiff Public Employees' Retirement System of Mississippi is a governmental defined benefit pension plan qualified under Section 401(a) of the Internal Revenue Code, and is the retirement system for nearly all non-federal public employees in the State of Mississippi. Established by the Mississippi Legislature in 1952, Mississippi PERS provides benefits to over 75,000 retirees, and future benefits to more than 250,000 current and former public employees. Mississippi PERS acquired Certificates pursuant and/or traceable to the Offering Documents. Mississippi PERS purchased 775,000 Series 2007-A Mortgage Pass-Through Certificates issued by the MLFFML Trust Series 2007-A and Series 2007-F1 Mortgage Pass-Through Certificates issued by the Merrill Lynch Alternative Note Asset Trust, Series 2007-F1, as reflected in Exhibit 1 attached hereto.

B.     Defendants

17.     Defendant Merrill Lynch & Co., Inc. is a Delaware Corporation with its principal executive office located at 250 Vesey Street, 4 World Financial Center, New York, New York. Merrill Lynch has offices around the world, including in Los Angeles and other California locations.  As an investment bank, Merrill Lynch is a global trader and underwriter of securities and derivatives across a broad range of asset classes and serves as a strategic advisor to corporations, governments, institutions and individuals worldwide.  Merrill Lynch created and controls MLMI, a limited purpose, wholly-owned subsidiary designed to facilitate the issuance and sale of the Certificates.  Merrill Lynch acted as an "Underwriter" of the Certificates within

the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11). As an underwriter, Merrill Lynch participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.

18.    Defendant Merrill Lynch Mortgage Lending, Inc. is a Delaware corporation with its principal place of business located at 250 Vesey Street, 4 World Financial Center, New York, New York. MLML is an indirect, wholly-owned subsidiary of Merrill Lynch. MLML is also an affiliate of MLMI, First Franklin, and MLPFS. MLML purchases first and second lien residential mortgage loans for securitization or resale, or for its own investment. MLML served as the "Sponsor" and/or "Seller" in the securitization of certain of the Issuing Trusts; and, in coordination with MLPFS, worked with ratings agencies, loan sellers and servicers in structuring the securitization transactions related to the Certificates.

19.    Defendant Merrill Lynch Mortgage Investors, Inc. is a Delaware corporation and a limited purpose, indirect wholly-owned subsidiary of Merrill Lynch, with its principal place of business located at 250 Vesey Street, 4 World Financial Center, New York, New York. MLMI is an affiliate, of MLML, First Franklin and MLPFS. MLMI served in the role as "Depositor" in the securitization of the Issuing Trusts, and was an "Issuer" of the Certificates within the meaning of Section 15 of the Securities Act, 15 U.S.C. § 77b(a)(4).

20.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is a Delaware corporation with its principal place of business located at 250 Vesey Street, 4 World Financial Center, New York, New York. MLPFS is an affiliate of MLML, First Franklin and MLMI. MLPFS acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11). As an underwriter, MLPFS participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.

21.    Defendant First Franklin Financial Corporation is an operating subsidiary of a Merrill Lynch entity Merrill Lynch Bank & Trust Co., FSB, with its principal place of business located at 2150 North First Street, San Jose, California, and a retail mortgage origination office

in Lake Forest, California. First Franklin is also an affiliate of MLML, MLMI, and MLPFS. First Franklin originated mortgage loans that were sold directly, or indirectly through MLML, to MLMI, and served as the "Sponsor" in the securitization of certain of the Issuing Trusts; and, in coordination with MLPFS, worked with ratings agencies, loan sellers and servicers in structuring the securitization transactions related to the Certificates.

22.     Defendant Credit-Based Asset Servicing and Securitization LLC ("C-BASS") was incorporated in the State of Delaware in July 1996. C-Bass's principal business in the purchasing of residential mortgage loans, primarily subprime in nature, from multiple parties including banks and other financial institutions, and mortgage-related securities for investment and securitization. The principal executive offices of C-BASS are located at 335 Madison Avenue, 19th Floor, New York, New York 10017. C-BASS served as the "Sponsor" in the securitization of certain of the Issuing Trusts; and, in coordination with MLPFS, worked with ratings agencies, loan sellers and servicers in structuring the securitization transactions related to the Certificates.

23.     Defendant J.P. Morgan Securities, Inc. ("J.P. Morgan") was one of the underwriters of certain Certificates. JP Morgan helped draft and disseminate the Offering Documents.

24.     Defendant ABN AMRO Incorporated ("ABN AMRO") was one of the underwriters of certain Certificates. ABN AMRO helped draft and disseminate the Offering Documents.

25.     Defendant McGraw-Hill Companies is a New York corporation with its principal place of business located at 1221 Avenue of the Americas, New York, New York 10020, and several offices located in California. Standard & Poor's, a division of McGraw-Hill Companies, provides credit ratings, risk evaluation, investment research and data to investors. S&P acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11). S&P participated in the drafting and dissemination the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.

8

In addition, S&P worked with MLML, loan sellers and servicers in structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

26.     Defendant Moody's Investors Service, Inc. is a division of Moody's Corp., a Delaware corporation with its principal place of business located at 250 Greenwich Street, New York, New York 10007, with a regional Moody's office located at One Front Street, Suite 1900, San Francisco, California.   Moody's provides credit ratings, research and risk analysis to investors. Moody's acted as an "Underwriter" of the Certificates within the meaning of the Securities Act, 15 U.S.C. § 77b(a)(11).  Moody's participated in the drafting and dissemination of the Prospectus Supplements pursuant to which the Certificates were sold to Plaintiff and other Class members.  In addition, Moody's worked with MLML, loan sellers and servicers in structuring the securitization transactions related to the Certificates, and then provided pre-determined credit ratings for the Certificates, as set forth in the Prospectus Supplements.

27.     Defendant McGraw-Hill Companies, inclusive of S&P, and defendant Moody's are collectively referred to herein as the "Rating Agency Underwriters."

28.     Defendants MLPFS, Merrill Lynch, JP Morgan, ABN AMRO and the Rating Agency Underwriters are collectively referred to herein as the "Underwriter Defendants."

29.     Defendants, the Issuing Trusts, were created and structured by MLMI to issue billions of dollars worth of Certificates pursuant to the Registration Statements and Prospectuses.  For each offering by the Issuing Trusts, MLMI served as the "Depositor," MLPFS or Merrill Lynch served as a designated "Underwriter," and either MLML, C-BASS or First Franklin served as the "Sponsor"/"Seller."

30.     With respect to the March Registration Statement, the following chart identifies the following: (1) each Issuing Trust; (2) the Prospectus Supplement dates pursuant to which the Certificates were issued and sold; (3) the stated value of the Certificates issued; and (4) the Sponsor.

| Issuing Entity | Approximate Amount ($$$) | SEC Filing Date of Prospectus Supplement | Sponsor |
|---|---|---|---|
| First Franklin Mortgage Loan Trust, Series 2007-Ffc | 476,443,000 | 5/29/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-A2 | 873,387,100 | 4/2/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-A3 | 483,874,100 | 4/30/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-Af1 | 680,620,637 | 6/1/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-Oar2 | 607,592,100 | 4/2/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-Oar3 | 388,234,100 | 7/2/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-Oar4 | 346,530,100 | 8/10/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-Oar5 | 547,540,000 | 11/2/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-1 | 2,185,364,100 | 3/27/2007 | First Franklin Financial Corporation |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2 | 1,937,062,100 | 4/27/2007 | First Franklin Financial Corporation |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3 | 1,835,617,100 | 5/30/2007 | First Franklin Financial Corporation |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4 | 1,547,200,100 | 6/26/2007 | First Franklin Financial Corporation |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-5 | 653,458,100 | 10/10/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-A | 219,636,100 | 9/7/2007 | First Franklin Financial Corporation |
| Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-H1 | 830,878,100 | 10/11/2007 | First Franklin Financial Corporation |
| Merrill Lynch Mortgage Backed Securities Trust, Series 2007-2 | 619,161,000 | 6/28/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Backed Securities Trust, Series 2007-3 | 302,096,000 | 7/31/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2007-He2 | 1,161,681,100 | 4/2/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2007-He3 | 630,134,100 | 6/8/2007 | Merrill Lynch Mortgage Lending, Inc. |

| | | | |
|---|---|---|---|
| Merrill Lynch Mortgage Investors Trust, Series 2007-Mln1 | 1,298,608,100 | 4/27/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2007-Sd1 | 329,226,100 | 6/11/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2007-Sl1 | 243,202,100 | 5/15/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series Mlcc 2007-2 | 412,174,000 | 5/31/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series Mlcc 2007-3 | 291,834,000 | 8/28/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Specialty Underwriting And Residential Finance Trust, Series 2007-Bc2 | 370,500,100 | 4/24/2007 | Merrill Lynch Mortgage Lending, Inc. |

31.    With respect to the December Registration Statement, the following chart identifies the following: (1) each Issuing Trust; (2) the Prospectus Supplement dates pursuant to which the Certificates were issued and sold; (3) the stated value of the Certificates issued; and (4) the Sponsor.

| Issuing Entity | Approximate Amount ($$$) | SEC Filing Date of Prospectus Supplement | Sponsor |
|---|---|---|---|
| 2006-CB8 Trust | 517,954,000 | 11/1/2006 | C-BASS |
| 2006-CB4 Trust | 483,150,000 | 6/15/2006 | C-BASS |
| First Franklin Mortgage Loan Trust, Series 2006-Ff18 | 2,346,241,100 | 12/26/2006 | Merrill Lynch Mortgage Lending, Inc. |
| First Franklin Mortgage Loan Trust, Series 2007-Ff1 | 1,987,127,100 | 1/25/2007 | Merrill Lynch Mortgage Lending, Inc. |
| First Franklin Mortgage Loan Trust, Series 2007-Ff2 | 2,535,000,100 | 2/28/2007 | Merrill Lynch Mortgage Lending, Inc. |
| First Franklin Mortgage Loan Trust, Series 2007-Ffa | 457,685,100 | 2/9/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Alternative Note Asset Trust Series 2007-A1 | 804,235,100 | 2/12/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-F1 | 439,565,336 | 3/28/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Alternative Note Asset Trust, Series 2007-Oar1 | 424,684,100 | 3/13/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-A2 | 339,079,100 | 4/28/2006 | Merrill Lynch Mortgage Lending, Inc. |

| | | | |
|---|---|---|---|
| Merrill Lynch Mortgage Backed Securities Trust, Series 2007-1 | 449,369,000 | 3/30/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-Sd1 | 154,623,100 | 9/12/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust Series 2006-A3 | 551,584,100 | 5/31/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust Series 2006-A4 | 378,867,000 | 7/28/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust Series 2006-Af1 | 657,884,823 | 10/2/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-He5 | 1,318,503,100 | 9/28/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-Mln1 | 787,216,100 | 9/28/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-Opt1 | 882,500,100 | 9/26/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-Rm4 | 547,934,100 | 9/28/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-Sd1 | 154,623,100 | 9/12/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust Series Mlcc 2006-3 | 532,808,000 | 10/26/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust Series Mlcc 2007-1 | 457,830,000 | 1/29/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-Fm1 | 424,683,100 | 6/29/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust Series 2006-Af2 | 666,063,328 | 10/31/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-F1 | 225,276,307 | 4/27/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-Ff1 | 2,280,872,100 | 12/22/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-He6 | 906,616,100 | 12/27/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-Rm2 | 954,066,100 | 5/31/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-Rm5 | 520,625,100 | 10/27/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-Sl2 | 233,231,100 | 8/7/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2007-He1 | 1,130,135,100 | 3/8/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust Series Mlcc 2006-2 | 628,422,100 | 4/27/2006 | Merrill Lynch Mortgage Lending, Inc. |

| | | | |
|---|---|---|---|
| Ownit Mortgage Loan Trust, Series 2006-4 | 770,864,100 | 6/26/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Ownit Mortgage Loan Trust, Series 2006-5 | 452,071,100 | 7/26/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Specialty Underwriting And Residential Finance Trust, Series 2006-Ab2 | 380,200,100 | 5/31/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-Ahl1 | 413,329,100 | 6/29/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-Ar1 | 661,166,100 | 4/26/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-He2 | 549,172,100 | 4/10/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-He3 | 532,215,100 | 6/20/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-He4 | 481,972,100 | 7/26/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Merrill Lynch Mortgage Investors Trust, Series 2006-Rm3 | 740,607,100 | 6/27/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Ownit Mortgage Loan Trust, Series 2006-7 | 656,549,100 | 11/2/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Ownit Mortgage Loan Trust, Series 2006-3 | 526,398,100 | 4/13/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Ownit Mortgage Loan Trust, Series 2006-6 | 407,900,100 | 9/22/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Specialty Underwriting And Residential Finance Trust, Series 2006-Ab3 | 412,248,100 | 9/25/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Specialty Underwriting And Residential Finance Trust, Series 2006-Bc4 | 1,059,300,100 | 9/26/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Specialty Underwriting And Residential Finance Trust, Series 2006-Bc3 | 818,550,100 | 6/23/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Specialty Underwriting And Residential Finance Trust, Series 2006-Bc5 | 829,099,100 | 11/24/2006 | Merrill Lynch Mortgage Lending, Inc. |
| Specialty Underwriting And Residential Finance Trust, Series 2007-Ab1 | 343,700,100 | 3/26/2007 | Merrill Lynch Mortgage Lending, Inc. |
| Specialty Underwriting And Residential Finance Trust, Series 2007-Bc1 | 789,110,100 | 1/24/2007 | Merrill Lynch Mortgage Lending, Inc. |

32.    Defendants MLMI, Merrill Lynch and the Issuing Trusts are collectively referred to herein as the "Issuing Defendants."

13

33.    Defendant Matthew Whalen ("Whalen") was, at all relevant times, President and Chairman of the Board of Directors of MLMI.  Defendant Whalen signed the December 21, 2005 Registration Statement.

34.    Defendant Paul Park ("Park") was, at relevant times, the President and Chairman of the Board of Directors of MLMI.  Defendant Park signed the February 2, 2007 Registration Statement.   While serving as President and Chairman of MLMI, defendant Park was concurrently a managing partner of defendant Merrill Lynch.

35.    Defendant Brian T. Sullivan ("Sullivan") was, at relevant times, the Vice President, Treasurer (Principal Financial Officer) and Controller of MLMI.  Defendant Sullivan signed the Registration Statements.

36.    Defendant Michael M. McGovern ("McGovern") was, at relevant times, a Director of MLMI.  Defendant McGovern signed the Registration Statements.  While serving as a Director of MLMI, defendant McGovern was concurrently a Director and Senior Counsel of defendant Merrill Lynch.

37.    Defendant Donald J. Puglisi ("Puglisi") was, at relevant times, a Director of MLMI.  Defendant Puglisi signed the Registration Statements.

38.    Defendants Whalen, Park, Sullivan, McGovern and Puglisi are collectively referred to herein as the "Individual Defendants."

IV.    <u>FACTUAL BACKGROUND</u>

A.    <u>The Development Of The Secondary Mortgage Market And Subprime Mortgages</u>

39.    Traditionally, consumers wishing to finance the purchase of a house (or other property) were able to obtain a 30-year or 15-year fixed rate mortgage or a conventional adjustable rate mortgage ("ARM") through a mortgage lender that would profit by servicing the loans and collecting interest payments over the life of the mortgages.  As such, the lender (or loan originator) had an interest in making sure that borrowers were able to repay their loans; or that loans were at least adequately collateralized in the case of default.

40.    To increase available funds for borrowers, the U.S. government chartered Government Sponsored Enterprises ("GSEs"), such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The GSEs were empowered to buy mortgages (*i.e.,* the rights to repayment of the loans) from loan originators, thus developing a secondary market for mortgages. Once bought, the loans were pooled together, securitized and sold to investors as "mortgage backed securities," or "MBS." The money that a loan originator earned from the loan sales was then used to finance new mortgages, thereby increasing the lender's revenues.

41.    Investors who purchased MBS would (typically) receive monthly payments over the lifetime of the underlying loans, in accordance with the borrowers' payments of principal and interest. To protect MBS investors, the GSEs only purchased loans that met approved underwriting standards. In addition, the prices of the MBS were discounted to account for an assumed rate of default or non-payment of a certain percentage of loans.

42.    From 1995 to 2005, the housing market experienced a dramatic rise in home ownership. According to the Research Department of the Federal Reserve Bank of San Francisco ("FRBSF"), after decades of relative stability, the rate of U.S. homeownership began to surge as 12 million more Americans became homeowners between 1994 and 2004. The increased demand also resulted in a growth in new home construction. In 2005, according to the U.S. Census Bureau, 1,283,000 newly-constructed single-family houses sold, compared with an average of 609,000 per year from 1990 to 1995.

43.    Investment banks such as Merrill Lynch and other entities became active in and profited from the lucrative secondary market for mortgage loans. Unlike GSEs, investment banks were not constrained by the same strict conditions and restrictions when purchasing loans from loan originators. As the secondary market for loans originated with less stringent underwriting standards expanded, loan originators were increasingly able to lend to borrowers with higher credit-risk profiles without absorbing all of the increased risk. In exchange for the increased risk of default and/or delinquencies, the loan originators provided the loans at higher

15

interest rates – *i.e.*, subprime loans – with higher potential rates of return, due to the higher interest percentage charged to the borrowers and thus the higher rate of return to investors in the secondary market.

44.    In recent years, several factors led to greater demand for subprime and alternative loan mortgages in the secondary market.  Perhaps the most significant factor was the introduction of new pricing models, the Gaussian copula models developed by David X. Li, which allowed for rapid pricing of exotic finance structures that relied upon pooled mortgages and MBS.  The increased demand in the secondary market, along with persistent low interest rates and low inflation (perhaps caused by the increased demand in the secondary market), facilitated consumer borrowing.

45.    Concurrently, as loan originators increased the amount of loans sold rather than held and serviced, they became less vigilant in guarding against the risk of defaults and delinquencies because they were able to quickly transfer the risk to purchasers in the secondary market.  Loan fees and sales revenue became the lender's primary profit mechanism, making the sheer quantity of loans issued more important than the quality of any particular loan.  To facilitate more loans, lenders began to offer more aggressive loan products such as subprime mortgages, hybrid loans and negative amortization "option ARM" loans, with little or no documentation.  In addition, it is now known that loan originators abandoned their stated underwriting and appraisal standards, and other methods of risk assessment, in order to increase loan origination quantities.

46.    According to Harvard University's Joint Center for Housing Studies, between 2001 and 2005, the subprime market grew from just $210 billion (in real terms) to $625 billion, amounting to approximately 20% of the total residential loans originated in 2005.  The FRBSF observed that "it seems probable that the growth in the subprime market [gave] many households access to credit that would previously have been denied."  This time period also saw a dramatic growth in Alt-A loans, a characteristic of which was reduced or eliminated documentation required to secure a mortgage (commonly referred to as a "liar loan").

According to a report by rating agency S&P, Alt-A originations increased from less than $20 billion in 2000 to more than $300 billion in 2005.

47.    The end result was a mortgage paradigm shift where loan originators allowed consumers to borrow more money than they could afford to repay. As consumers were able to borrow more, they were able to spend more. Accordingly, housing prices kept rising. In that environment, consumers who were unable to repay their loans could simply borrow more money (against increased equity) or sell their house at a perpetually increasing price to other consumers – who likely borrowed more than they could afford to repay, as well. Thus, in the sky-rocketing housing market, the effects of the loan originators' over-aggressive lending practices were not immediately realized.

48.    Eventually, however, the aggressive lending practices overburdened the housing market. Housing prices peaked, loan volume leveled-off and loan defaults and delinquencies started to rise. Without underlying repayment revenues and adequate collateral value to support MBS, the credit market began deteriorating and investors in mortgaged-backed instruments, directly or through derivative instruments such as asset-backed or mortgage pass-through certificates, experienced tremendous losses.

B.    The Mechanics Of Structuring Asset-Backed Pass-Through Certificates

49.    Asset-backed pass-through certificates (or mortgage pass-through certificates, as they are more commonly referred) are securities in which the holder's interest represents an equity interest in the "issuing trust." The pass-through certificates entitle the holder to income payments from pools of mortgage loans and/or MBS. Although the structure and underlying collateral of the mortgages and MBS vary, the basic principle is the same.

50.    First, a "depositor" acquires an inventory of loans from a "sponsor"/"seller," who either originated the loans or acquired the loans from other loan originators, in exchange for cash. The type of loans in the inventory may vary, including conventional, fixed or adjustable rate mortgage loans (or mortgage participations), secured by first liens, junior liens,

or a combination of first and junior liens, with various lifetimes to maturity.  The depositor then transfers, or deposits, the acquired pool of loans to the issuing trust entity.

51.    The issuing trust then securitizes the pool of loans so that the rights to the cash-flows from the inventory can be sold to investors.  The securitization transactions are structured such that the risk of loss is divided among different levels of investment, or "tranches." Although technically different instruments, tranches are related MBS offered as part of the same pass-through certificate offering, each with a different level of risk and reward.  Any losses to the underlying loans, due to default, delinquency or otherwise, are applied in reverse order of seniority.  As such, the most senior tranches of pass-through certificates are often rated as the best quality, or "AAA."  Junior tranches, which usually obtain lower ratings, ranging from "AA" to "BBB-," are less insulated from risk, but offer greater potential returns.

52.    By working with the underwriters, the depositor, and the rating agencies, the issuing trust is able to ensure that each particular mortgage pass-through certificate tranche will receive a pre-determined rating by pre-determined rating agencies at the time of offering.  Once the tranches are established, the issuing trust passes the certificates back to the depositor, who then passes the certificates to one or more underwriter.  The underwriter offers the various certificates to investors, in exchange for cash that will be passed back to the depositor, minus any fees owed to the underwriters.



53.    Each purchased or acquired certificate represents an equity interest in the issuing trust and the right to future payments of principal and interest on the underlying loans.  Those payments are collected by the loan servicer and distributed, through the issuing trust, to

investors at regular distribution intervals throughout the life of the loans. Mortgage pass-through certificates must be offered to the public pursuant to a registration statement and prospectus in accordance with the provisions of the Securities Act.

      C.     <u>Assessing The Quality Of A Mortgage Pass-Through Certificate Investment</u>

      54.     The fundamental basis upon which certificates are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral. Thus, proper loan underwriting is critical to assessing the borrowers' ability to repay the loans, and a necessary consideration when purchasing and pooling loans. If the loans pooled in the MBS were to suffer defaults and delinquencies in excess of the assumptions built into the certificate payment structure, as set forth in the offering prospectus, certificate owners would suffer more than expected losses as income necessary to service the certificates would necessarily diminish.

      55.     Likewise, independent and accurate appraisals of the collateralized real estate are essential to ensure that the mortgage or home equity loan can be satisfied in the event of a default and foreclosure on a particular property. In the event of a foreclosure, an accurate appraisal is necessary to determine the likely price at which the foreclosed property can be sold and thus the amount of money that issuing trust would receive and be able to pass through to certificate holders.

      56.     An accurate appraisal is also critical to calculating loan-to-value ("LTV") ratio, which is a financial metric commonly used to evaluate the price and risk of MBS and mortgage pass-through certificates. The LTV ratio expresses the amount of mortgage or loan as a percentage of the appraised value of the collateral property. For example, if a borrower seeks to borrow $90,000 to purchase a home worth $100,000, the LTV ratio is equal to $90,000 divided by $100,000, or 90%. If, however, the appraised value of the house has been artificially inflated to $100,000 from $90,000, the real LTV ratio would be 100% ($90,000 divided by $90,000).

      57.     From an investor's perspective, a high LTV ratio represents a greater risk of default on the loan. First, borrowers with a small equity position in the underlying property

have "less to lose" in the event of a default.  Second, even a slight drop in housing prices might cause a loan with a high LTV ratio to exceed the value of the underlying collateral, which might cause the borrower to default and would prevent the issuing trust from recouping its expected return in the case of foreclosure and subsequent sale of the property.

58.    Consequently, the LTV ratios of the loans underlying mortgage pass-through certificates are important to investors' assessment of the value of such certificates.  Indeed, prospectuses typically provide information regarding the LTV ratios, and even guarantee certain LTV ratio limits for the loans that will support the offered certificates.

59.    The underwriting standards and appraisals of the pooled loans are critically important considerations when setting assumptions and parameters for each certificate tranche. The assumed amount of expected payments of principal and interest will necessarily affect the total available funds and potential yield to investors.  In addition, the assumed amount of expected payments will affect the offered credit enhancement, such as overcollateralization, excess interest, shifting of interests, and subordination.

60.    Overcollateralization is the amount by which the aggregate stated principal balance of the mortgage loans exceeds the aggregate class principal balance for the certificate tranches.  In other words, overcollateralization serves as a cushion, so that in the case of default on certain loans, the remaining payments would be adequate to cover the yield on all certificates without any tranche taking a loss.

61.    A similar cushion is provided by the interest generated by the loans in excess of what is needed to pay the interest on the certificates and related expenses of the trust.  Often, the tranches are structured so that the weighted average interest rate of the mortgage loans is higher than the aggregate of the weighted average pass-through rate on the certificates, plus servicing fee rates on the mortgage loans.

62.    If the assumed underwriting standards and appraisals are inaccurate, or the loan purchasing guidelines used to acquire those loans are disregarded, the stated credit enhancement

parameters will be inaccurate, and investors will not receive the level of protection as set forth in the respective registration statement and prospectus(es).

     D.    The Role Of The Ratings Agencies In Structuring And Rating Certificates

     63.    Traditionally, rating agencies published ratings to reflect an unbiased assessment of risk associated with a particular investment instrument. Historically, an overwhelming majority of the rating agencies' revenues were generated by fees from subscribers who received their research and ratings. In the structured finance arena (*i.e.*, mortgage pass-through certificates and other MBS), however, rating agencies often played an active role in structuring the very instruments that they rated – and they received lucrative fees for their services.

     64.    The rating of any particular MBS was critical to its issuance because of regulations requiring many institutional investors, such as banks, mutual funds and public pension funds, to hold only "investment-grade" bonds and securitized interests. Indeed, many MBS – including mortgage pass-through certificates – were geared towards, and promoted to, institutional investors. Here, in fact, each of the Prospectus Supplements stated, "The offered certificates may be inappropriate for individual investors."

V.    CERTIFICATES OFFERED BY DEFENDANTS

     65.    In theory, the loan securitization process entails a series of "arm's-length" transactions where the certificates are valued, appropriately priced and sold to investors. The depositor pays a fair price to the sponsor/seller based on the represented quality of the pool of loans. The depositor then verifies the quality of the loans and transfers them to the issuing trust. The depositor then works with the underwriters to assess the likely cash-flows from the loan repayments and, based on those calculations, sets the parameters and expected yield of each certificate tranche that the underwriter will offer to investors.

     66.    Merrill Lynch, through a subsidiary, established MLMI for the sole purpose of issuing the Certificates. MLMI filed with the SEC the Registration Statements and Prospectuses, identifying itself as the "Depositor" of a to-be-determined series of Certificate offerings, pursuant to forthcoming Prospectus Supplements.

67.     The Prospectuses and Prospectus Supplements provided information to investors about the Certificates in more detail in progression.  First, the Prospectuses provided general information regarding the Certificate offerings.  Then, the respective Prospectus Supplements provided the specific terms of the particular Certificate series offering.

68.     The Prospectuses provided that MLMI would offer a series of Certificates representing beneficial ownership interests in the related Issuing Trusts and that the assets of each trust would consist of assets from one of the following categories: (i) one or more segregated pools of various types of mortgage loans or closed-end and/or revolving home equity loans (or certain balances of these loans), in each case secured by first and/or junior liens on one- to five-family residential properties, or security interests in shares issued by cooperative housing corporations, including mixed residential and commercial structures; (ii) manufactured housing installment contracts and installment loan agreements secured by senior or junior liens on manufactured homes and/or by mortgages on real estate on which the manufactured homes are located; (iii) home improvement installment sales contracts or installment loan agreements originated by a home improvement contractor and secured by a mortgage on the related mortgaged property that is junior to other liens on the mortgaged property; and (iv) certain direct obligations of the United States, agencies thereof or agencies created thereby.

69.     Subsequent to filing the Prospectuses, MLMI caused to be filed Prospectus Supplements for each of the Issuing Trusts.  For example, on September 6, 2007, MLMI filed with the SEC a Prospectus Supplement offering Series 2007-A Asset-backed Pass-Through Certificates on behalf of the MLFFML Trust, Series 2007-A Issuing Trust.  On March 23, 2007, MLMI filed with the SEC a Prospectus Supplement offering Series 2007-F1 Asset-backed Pass-Through Certificates on behalf of the Merrill Lynch Alternative Note Asset Trust, Series 2007-F1.

70.     In the Prospectuses and each of the respective Prospectus Supplements, MLMI was identified as the Depositor for the Issuing Trusts' Certificate offerings.  While MLMI

served as the Depositor for each of the Issuing Trusts, it was directed and controlled by Merrill Lynch.

71.    The Registration Statements, and each of the respective Prospectus Supplements, identified MLML, C-BASS, or First Franklin as the "Sponsor" and/or "Seller" of the loans acquired by the Depositor, MLMI.  While MLML and/or First Franklin served as the Sponsor and/or Seller for each of the Issuing Trusts, they were directed and controlled by Merrill Lynch.

72.    According to the Registration Statements and Prospectus Supplements, the Depositor acquired a pool of loans, either from First Franklin or C-BASS, who originated or acquired the loans, or from MLML, who purchased the loans or otherwise acquired them through bulk or single purchases.  A pool of loans was then sold to the Depositor and passed-through to the Issuing Trusts.

73.    MLMI, the Depositor, then worked with the Underwriter Defendants and MLML, C-BASS or First Franklin to structure the securitization transactions and price the Certificates.  Per the Offering Documents, MLPFS, Merrill Lynch, JP Morgan and ABN AMRO were designated "Underwriters."  In addition, by way of their actual participation and conduct in structuring the transactions, the Rating Agency Underwriters directly and indirectly participated in the distribution process.  Specifically, the Rating Agency Underwriters participated in structuring the transactions and, as a condition to the issuance of the Certificates, provided investment-grade ratings as detailed in each of the Prospectus Supplements.

74.    As stated in the Prospectuses and the Prospectus Supplements, MLPFS, Merrill Lynch, JP Morgan and ABN AMRO, as designated Underwriters, purchased the Certificates and offered them to investors, including Plaintiff and other Class members.  The proceeds from those sales were then transferred to MLMI (the Depositor), net of underwriting fees.

VI.    DEFENDANTS MISREPRESENTED THE NATURE
       OF THE LOANS UNDERLYING THE CERTIFICATES

75.    The Offering Documents contained material statements regarding, *inter alia*, (i) the underwriting process and standards by which the loans held by the respective Issuing Trusts

were originated, including the type of loan and documentation level; (ii) the standards and guidelines used by First Franklin and/or MLML when evaluating and acquiring the loans; (iii) representations concerning the value of the underlying real-estate securing the loans pooled in the respective Issuing Trusts, in terms of LTV averages and the appraisal standards by which such real estate values were measured; and (iv) the level of credit enhancement, such as overcollateralization and excess interest, calculated to afford a certain pre-determined level of protection to investors.

76.     Each Prospectus Supplement included tables with data concerning the loans underlying the Certificates, including (but not limited to) the type of loans, the number of loans, the mortgage rate and net mortgage rate, the aggregate scheduled principal balance of the loans, the weighted average original combined LTV ratio, and the geographic concentration of the mortgaged properties.

     A.     <u>Representations Regarding Loan Origination Underwriting</u>

77.     Although the percentages vary among the Issuing Trusts, the Prospectus Supplements stated that First Franklin originated, or MLML acquired most of the mortgage loans underlying the Certificates.  For example, the MLFFML Trust, Series 2007-A Prospectus Supplement stated that "All of the Mortgage Loans were originated by the Sponsor [First Franklin].  Certain of the Mortgage Loans were subsequently purchased by [MLML] from the sponsor in bulk acquisition.  All of the Mortgage Loans will be transferred and assigned by either [First Franklin or MLML] to the Depositor on the Closing Date."

78.     The Prospectus Supplements represented that the mortgage loans underlying the Certificates "were originated generally in accordance with the underwriting guidelines described in 'Underwriting Guidelines'" in this Prospectus Supplement.[3]

79.     As represented in the Prospectus Supplements, the Sponsor's underwriting and acquisition underwriting standards were primarily intended to assess the ability and willingness

---

[3]  The Prospectus Supplements for each Issuing Trust uniformly used the same or substantially similar language.

of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgaged loan. As represented, First Franklin did, and third-party originators were required to, conduct a number of quality control procedures, including a post funding compliance audit as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the asset quality procedure, each originator was supposed to review a random selection of each month's originations.

80.     Regarding acquired loans, the Prospectus Supplements represented that the standards adopted by the Sponsor required that the mortgage loans of a type similar to the Mortgage Loans were underwritten by third party originators with a view toward the resale of the mortgage loans in the secondary mortgage market. In accordance with the Sponsor's guidelines for acquisition, the third party originators must have considered, among other things, the mortgagor's credit history, repayment ability, and debt service to income ratio, as well as the type and use of the mortgaged property. In addition, the Prospectus Supplements represented that each of the loan originators must have met minimum standards set by First Franklin and/or MLML, based on certain acquisition guidelines, in order to submit loan packages, and that those loans must have been in compliance with the terms of a signed mortgage loan purchase agreement.

81.     Furthermore, the Prospectus Supplements represented that third party originators of loans acquired by First Franklin (or indirectly by MLML, through First Franklin) were originated in accordance with the underwriting program called the Direct Access Program, which relied upon a borrower's credit score to determine a borrower's likely future credit performance. First Franklin's acquisition guidelines required that the third party originator approve the Mortgage Loan using the Direct Access Program risk-based pricing matrix.

82.     As noted, the Prospectus Supplements indicated that certain of the loans underlying the Certificates were issued pursuant to reduced or alternative documentation programs offering varying types of loans products, such as balloon payment or alternative rate

mortgage loans. A statistical breakdown of the loans categorized by documentation level is included in the Prospectus Supplement for each Issuing Trust.

B.    Representations Regarding Appraisals

83.    As represented in the Prospectus Supplements, the securitization transactions were designed around the assumption that the related mortgaged properties would provide adequate security for the mortgage loans, based in part on the appraised value of the properties securing the mortgage loans underlying the Certificates.  The adequacy of the mortgaged properties as security for repayment of the loans will have generally been determined by appraisals, conducted in accordance with pre-established guidelines.

84.    Each securing property was to be appraised by a qualified, independent appraiser, and each appraisal was required to satisfy applicable government regulations and be on forms acceptable to Fannie Mae and Freddie Mac.  As required by Fannie Mae and Freddie Mac, and as represented by the underwriting standards set forth in certain of the Prospectus Supplements, the appraisals were to be in conformity with the Uniform Standards of Professional Appraisal Practice ("USPAP"), as adopted by the Appraisal Standards Board of the Appraisal Foundation.

85.    With respect to real estate appraisals, USPAP requires, *inter alia*:

An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests.

In appraisal practice, an appraiser must not perform as an advocate for any party or issue.

An appraiser must not accept an assignment that includes the reporting of predetermined opinions and conclusions.

\*   \*   \*

It is unethical for an appraiser to accept an assignment, or to have a compensation arrangement for an assignment, that is contingent on any of the following:

1.    the reporting of a predetermined result (*e.g.*, opinion of value);

2.    a direction in assignment results that favor the cause of the client;

3.    the amount of a value opinion;

4.     the attainment of a stipulated result; or

5.     the occurrence of a subsequent event directly related to the appraiser's opinions and specific to the assignment's purpose.

86.     In addition, the Prospectus Supplements represented that the appraisal procedure guidelines used by the loan originators, including First Franklin and C-BASS, required an appraisal report that included market data analysis based on recent sales of comparable homes in the area.  If appropriate, the guidelines required a review appraisal, consisting of an enhanced desk, field review or automated valuation report confirming or supporting the original appraisal value of the mortgaged property.

87.     As represented in the Registration Statements and the Prospectuses, the "Loan-to-Value Ratio" or "LTV Ratio" of a mortgage loan at any given time is the ratio (expressed as a percentage) of the then outstanding principal balance of the mortgage loan plus the principal balance of any senior mortgage loan to the "value" of the related mortgage property.  Only if specified in a particular Prospectus Supplement may the LTV Ratio of certain mortgage loans exceed 100%.  The "value" of the mortgaged property, other than with respect to refinance loans, is generally the lesser of:  (a) the appraised value determined in an appraisal by the loan originator at the time of the origination, or (b) the sale price for such property.

88.     The Prospectus Supplements also provided information regarding the weighted average combined original LTV Ratio of the loans underlying the Certificates.  The Combined LTV Ratio is provided in each Prospectus Supplement, in association with various loan groupings, including by loan type and documentation level, property type and geographical location.  Moreover, each Prospectus Supplement made representations regarding the Combined LTV Ratio.  For example, the MLFFML Trust Series 2007-A Prospectus Supplement stated that "[t]he weighted average Combined Loan-to-Value Ratio of the Mortgage Loans as of the Cut-off date was 99.54%."

C.    Representations Regarding Credit Enhancement

89.    Defendants, in structuring the Certificate tranche parameters, provided for certain "Credit Enhancement," as set forth in the Prospectus Supplements.  Credit Enhancement is intended to provide protection to the holders of the Certificates against shortfalls in payments received on the mortgage loans and helps increase the likelihood of the receipt of all payments under the agreements pursuant to which the Certificates are issued.  The Certificate securitization and offering transactions provide various forms of credit enhancement, including subordination, shifting interests, overcollateralization and excess interest.  Each form of credit enhancement is necessarily dependant on the application and effectiveness of the originator's underwriting standards, as well as an accurate appraisal of the mortgaged real estate and the corresponding LTV ratio.

90.    Each of the Prospectus Supplements represented a pre-determined amount of overcollateralization.  For example, the MLFFML Trust, Series 2007-A Prospectus Supplement stated that the overcollateralization amount with respect to the Series 2007-A Certificates was 19.65% of the aggregated outstanding principal balance of the mortgage loans as of the cut-off date, ($219,636,100), or approximately $43,158,493.

91.    In addition, the Certificate securitization and offering transactions were structured such that the loans were expected to generate more interest than was needed to pay interest on the Certificates (and related expenses of the Issuing Trust).  Specifically, the weighted average interest rate of the mortgage loan was expected to be higher than the aggregate of the weighted average pass-through rate on the Certificates, plus the servicing fee rate on the mortgage loans.

92.    The credit enhancements represented in the Prospectus Supplements directly impact and correlate with the representations regarding the ratings assigned to each Certificate tranche in a series offering.  As stated in the Prospectus Supplements, the ratings assigned to mortgage pass-through certificates "address the likelihood of the receipt by certifcateholders of payments required under the operative agreements."  The ratings "take into consideration the

28

credit quality of the mortgage pool including any credit support providers, structural and legal aspects associated with the [C]ertificates, and the extent to which the payment stream of the mortgage pool is adequate to make payments under the [C]ertificates."   MLFFML Trust Series 2007-A Prospectus Supplement.[4]

93.     Here, the Rating Agency Underwriters worked directly with the Underwriter MLPFS, Depositor MLMI and Sponsors/Sellers First Franklin, C-BASS and MLML to structure the Certificate transactions to achieve certain ratings.  In fact, it was a condition of the issuance of the Certificates that each tranche in the series receive the respective ratings as set forth in the Prospectus Supplements.

D.     Defendants' Representations Failed To Disclose
       The True Risk Of Investing In The Certificates

1.     The Deterioration Of Underwriting Standards

94.     From 1995 to 2005, the housing market experienced a dramatic rise in home ownership, as 12 million more Americans became homeowners between 1994 and 2004. Likewise, in recent years, the subprime market has grown dramatically, enabling more and more borrowers to obtain credit who traditionally would have been unable to access it.  According to Inside Mortgage Finance, from 1994 to 2006, subprime lending increased from an estimated $35 billion, or 4.5 percent of all one-to-four family mortgage originations, to $600 billion, or 20% of originations.

95.     As detailed above, Wall Street aggressively pushed into the complex, high-margin business of packaging mortgages and selling them to investors as MBS, including mortgage pass-through certificates.  This aggressive push created a boom for the mortgage lending industry.  By buying and packaging mortgages, Wall Street enabled the lenders to extend credit even as the dangers grew in the housing market.  At the center of the escalation was Wall Street's partnership with subprime lenders.  This relationship was a driving force

---

[4] As is generally the case, the Prospectus Supplements for each Issuing Trust uniformly used the same or substantially similar language.

behind the once-soaring home prices and the spread of exotic loans that are now defaulting and foreclosing in record numbers.

96.    Merrill Lynch illustrates the point.  In 2002, Stanley O'Neal ("O'Neal") was named the chief executive officer ("CEO") of Merrill Lynch.  Immediately, O'Neal sought to increase Merrill Lynch's participation in ABS products, such as pass-through certificates and other similar collateralized debt obligation ("CDO") instruments.[5]  By way of example, Merrill Lynch increased its CDO originations from $2.2 billion in 2002 to $53.7 billion in 2006.  As CDO and other ABS originations sky-rocketed, so did the fees collected by Merrill Lynch.  Indeed, Merrill Lynch developed an insatiable appetite for mortgage loans, and especially for higher-yield, subprime loans that accounted for nearly two-thirds of all mortgages underlying its CDO products.

97.    To bolster its loan supply, Merrill Lynch instructed, and exerted pressure on loan originators to reduce underwriting standards to increase origination quantity.  Merrill Lynch exerted pressure on originators through extended credit lines and by acquiring all or part of the loan originator.  For example, in 2005, Merrill Lynch purchased a 20% share in one of its primary loan originators, Ownit Mortgage Solutions Inc. ("Ownit").  According to Ownit founder and CEO William Dallas ("Dallas"), Merrill Lynch, using its ownership stake and a $3.5 billion credit line as leverage, then instructed Ownit to lower its underwriting standards and to originate more higher-yield, riskier loans.  According to Dallas, Ownit complied with Merrill Lynch's directive, originating $6 billion in loans from September 2005 to December 2006.

98.    At the end of 2006, Merrill Lynch acquired First Franklin, another of its primary loan originators.  In addition, Merrill Lynch extended significant credit lines to other subprime lenders, such as Mortgage Lenders Network USA, Inc. and ResMAE.  Consequently, Merrill Lynch had a steady supply of loans and was able to keep driving its ABS and CDO originations,

---

[5] Collateralized debt obligations, or "CDOs," are a type of asset-backed security and structured credit product, structured similarly to mortgage pass-through certificates.

even as the housing market was starting to fall.  In fact, Merrill Lynch originated over $30 billion in CDO instruments in the first half of 2007 alone.

99.    As is now evident, far too much of the lending during that time was neither responsible nor prudent.  According to Ben S. Bernanke, Chairman of the Federal Reserve Board, in a March 14, 2008 speech at the National Community Reinvestment Coalition Annual Meeting, "[t]he deterioration in underwriting standards that appears to have begun in late 2005 is another important factor underlying the current crisis.  A large share of subprime loans that were originated during this time feature high combined loan-to-value ratios and, in some cases, layers of additional risk factors, such as a lack of full documentation or the acceptance of very high debt-to-income ratios."  In its March 2008 Policy Statement on Financial Market Developments, the President's Working Group on Financial Markets concluded that "[t]he turmoil in financial markets clearly was triggered by a *dramatic weakening of underwriting standards for U.S. subprime mortgages, beginning* in late 2004 and extending into early 2007." (Emphasis in original).  As U.S. housing prices subsequently declined, the delinquency rate for such mortgages soared.

100.    Another of Merrill Lynch's primary loan suppliers, Countrywide Home Loans, Inc. ("Countrywide Home Loans"), is among the originators that helped cause the mortgage crisis because it completely abandoned its underwriting standards in order to increase loan origination volume.  In fact, Countrywide Home Loans is now under investigation of its lending practices or the subject of enforcement action by several government regulators, including the Illinois Attorney General, the California Attorney General, the Connecticut Attorney General, the Federal Bureau of Investigation ("FBI") and Department of Justice, and regulators in the states of Washington, West Virginia, North Carolina, Indiana and Florida, among others.

101.    The rapid increase in mortgage defaults and home foreclosures between 2006 and 2008 – during the time when Merrill Lynch was still expanding its mortgage-related asset-backed instrument business, and was pressuring loan originators to lower their underwriting

standards – compromised the quality of the mortgage pools underlying the Certificates and thus diminished the value of the Certificates.

102.    As a result, the government has launched numerous investigations into the subprime mortgage lending industry, including Merrill Lynch.  In January 2008, the FBI announced criminal investigations into 14 mortgage lenders.  By April of 2008, the FBI's investigations had expanded to 19 mortgage lenders.  The government's investigations focused on subprime mortgage lending practices by major banks and companies.

103.    In May 2008, the FBI and the criminal division of the Internal Revenue Service formed a task force to examine mortgages that were made with little or no proof of the earnings or assets of borrowers.  The task force includes federal prosecutors in New York, Los Angeles, Philadelphia, Dallas and Atlanta. The task force is focusing on the role of mortgage lenders and brokers in low- or no-documentation loans, and is also examining how the loans were bundled into securities.

2.    The Investment-Grade Ratings
Misrepresented The True Risk Of The Certificates

104.    As detailed above, the Rating Agency Underwriters directly participated in structuring the securitization transactions underlying the Certificates and, as a condition to the issuing of the Certificates to the public, provided pre-determined ratings for the Certificates. These pre-determined credit ratings were, for virtually all tranches of the offered Certificates, investment-grade.  Moody's and S&P maintained investment-grade ratings on the Certificates until, at the earliest, April 24, 2008.

105.    The ratings provided by the Rating Agency Underwriters were unjustifiably high and did not represent the true risk of the Certificates, as they were based on insufficient information and faulty assumptions concerning how many underlying mortgages were likely to default.  The President's Working Group on Financial Markets, Policy Statement Financial Market Developments (March, 2008), confirms that there were flaws in credit rating agencies'

assessments of subprime MBS and other complex structured financial products, such as asset-backed pass-through certificates.

106.    Internal rating agency emails discovered and released by U.S. Congressional investigators reveal that some Rating Agency Underwriter employees suspected before the credit markets deteriorated that the Rating Agency Underwriters used lax standards for rating MBS.  For example, one email between colleagues at S&P stated, "Rating agencies continue to create and [sic] even bigger monster – the CDO market.  Let's hope we are all wealthy and retired by the time this house of cards falters."  As J.P. Morgan CEO Jamie Dimon observed, "There was a large failure of common sense.  Very complex securities should not have been rated as if they were easy to value bonds."

107.    Consequently, on June 11, 2008, the SEC proposed new rules that would, *inter alia*, prohibit rating agencies from issuing ratings on a structured product, including mortgage pass-through certificates, unless information on the assets underlying the product was made available; prohibit credit rating agencies from structuring the same products they rate; and require the public disclosure of the information used by credit rating agencies in determining a rating on a structured product, including information on the underlying assets.

## VII.    MATERIAL MISSTATEMENTS AND OMISSIONS IN THE OFFERING DOCUMENTS

108.    The Registration Statements for the Issuing Trusts contained an illustrative form of the prospectuses for use in the offering of the Certificates.  The Registration Statements were prepared by the Issuing Defendants and Underwriter Defendants, and signed by the Individual Defendants.  Along with the Registration Statements, the Prospectuses were filed providing details of the Certificate offerings.  The Prospectuses were prepared by the Issuing Defendants and the Underwriting Defendants.  Subsequently, Prospectus Supplements were filed with the SEC containing a detailed description of the mortgage pools underlying the Certificates and making certain representations about the loan origination process and the quality of the loans.  The Prospectus Supplements were prepared by the Issuer Defendants and the Underwriter

Defendants. The Rating Agency Underwriters directly participated in the structuring of the mortgage pools and, as a condition of the issuance of the Certificates, provided the investment-grade ratings predetermined in the Prospectus Supplements. The Underwriter Defendants sold the Certificates pursuant to the Prospectus Supplements. The Prospectuses were referenced and incorporated into the Registration Statements.

109. The Registration Statements and the Prospectuses stated the "Underwriting Guidelines" concerning the loans underlying each of the Certificates offered pursuant to the Registration Statements. Specifically, the Prospectus Supplements state that "All of the Mortgage Loans were required to meet the underwriting criteria substantially similar to that described in this prospectus supplement." Each of the Prospectus Supplements identified loan originators of the loans in the mortgage pools underlying the Certificates for that particular Issuing Trust and provided representations regarding the underwriting standards utilized by the identified loan originators.

110. The MLFFML Trust, Series 2007-A, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-1, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-5, First Franklin Mortgage Loan Trust, Series 2007-FFC, and Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-H1 Prospectus Supplements listed First Franklin as the loan originator of all of the loans in the mortgage pools underlying those Issuing Trusts. In regard to First Franklin's underwriting standards, these Prospectus Supplements stated that:

> First Franklin Financial's underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. The standards established by First Franklin Financial require that mortgage loans of a type similar to the Mortgage Loans be underwritten by First Franklin Financial with a view toward the resale of the mortgage loans in the secondary mortgage market. In accordance with First Franklin Financial's underwriting guidelines, First Franklin Financial considers, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio ("Debt

Ratio"), as well as the value, type and use of the mortgaged property.

*   *   *

***Wholesale Origination***.  A significant majority of the Mortgage Loans were originated by First Franklin Financial based on loan application packages submitted to First Franklin Financial by mortgage brokers that do not fund the mortgage loans themselves. These mortgage brokers must meet minimum standards set by First Franklin Financial and, once approved, the mortgage brokers are eligible to submit loan application packages in compliance with the terms of their mortgage broker agreements. . . .

***Retail Origination***.  First Franklin Financial originates loans in its retail channel based on loan applications submitted directly by borrowers in its operation located in Lake Forest, California.  The retail operation acquires customers primarily through online lead generators, but also relies to a small extent on direct mail and phone contact to solicit borrowers.

***CORE Program***.  All of the Mortgage Loans were originated by First Franklin Financial under an underwriting program called the CORE Program (the "CORE Program").   Within the CORE Program, there are four documentation programs.... While each underwriting program is intended to assess the risk of default, the CORE Program makes use of credit bureau risk scores (the "Credit Bureau Risk Score").  The Credit Bureau Risk Score is a statistical ranking of likely future credit performance developed by Fair, Isaac & Company ("Fair Isaac") and the three national credit repositories Equifax, Trans Union and Experian. . . .

In accordance with First Franklin Financial's guidelines, under the CORE Program, First Franklin Financial requires that the Credit Bureau Risk Score be used to determine program eligibility.... The Credit Bureau Risk Score, along with the loan-to-value ratio, is an important tool in assessing the creditworthiness of a borrower in the CORE Program.  However, these two factors are not the only considerations in underwriting a CORE Program mortgage loan. First Franklin Financial requires a review of each CORE Program mortgage loan to determine whether First Franklin Financial's guidelines for income, assets, employment and collateral are met.

In accordance with First Franklin Financial's Guidelines, all of the Mortgage Loans were required to be written by underwriters having the appropriate signature authority. Each underwriter is granted a level of authority commensurate with his or her proven

judgment, maturity and credit skills. On a case by case basis, an underwriter may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception. Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address. It is expected that a limited portion of the Mortgage Loans may represent such underwriting exceptions.

111. In regards to First Franklin's underwriting and appraisal quality control procedures, the MLFFML Trust, Series 2007-A, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-1, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-2, Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-5, First Franklin Mortgage Loan Trust, Series 2007-FFC, and Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-H1 Prospectus Supplements stated:

> In accordance with First Franklin Financial's guidelines, the underwriters are required to verify the income of each applicant under various documentation programs. . . .
>
> First Franklin Financial is required to comply with applicable federal and state laws and regulations and generally requires an appraisal of the mortgaged property which conforms to Freddie Mac and/or Fannie Mae standards; and if appropriate, a review appraisal. Generally, appraisals are provided by appraisers approved by First Franklin Financial, but all review appraisals may only be provided by First Franklin Financial. . . .
>
> First Franklin Financial conducts a number of quality control procedures, including a post funding compliance audit as well as a full re-underwriting of a random selection of mortgage loans to assure asset quality. Under the asset quality audit, all mortgage loans are required to be reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedures, First Franklin Financial reviews a random selection of each month's originations. . . .
>
> Under the CORE Program, various risk categories are used to assess the likelihood that the applicant will satisfy the repayment conditions of the loan. These risk categories establish the maximum permitted loan-to-value ratio and loan amount, given the

occupancy status of the mortgaged property and the applicant's credit history and Debt Ratio.

112.    The Specialty Underwriting and Residential Finance Trust, Series 2007-AB1 and Specialty Underwriting and Residential Finance Trust, Series 2007-BC2 listed Specialty Underwriting and Residential Finance ("SURF") as the loan originator accounting for the loans in the mortgage pools underlying those Issuing Trusts, and stated that:

> SURF acts as a program administrator for the Sponsor, [MLML] and has developed a loan acquisition program to facilitate the purchase by [MLML] from various SURF-approved originators of certain eligible non-conforming loans.  The Mortgage Loans sold to the Depositor and from the Depositor to the Issuing Entity were originated generally in accordance with SURF Underwriting Guidelines…

> In most cases, the Mortgage Loans were either originated and underwritten in accordance with the SURF Underwriting Guidelines, or otherwise acquired from a mortgage collateral seller based on standards consistent with SURF underwriting criteria, loan program guidelines and credit grade classifications. Exceptions to the SURF Underwriting Guidelines are made where compensating factors exist or the Mortgage Loan is considered to be in substantial compliance with the SURF Underwriting Guidelines….

> The SURF Underwriting Guidelines are primarily intended to evaluate the prospective borrower's ability and willingness to repay the loan, determine the value and marketability of the proposed mortgage property, and ensure the loan complies with applicable regulations…. Mortgage Loans purchased by SURF are also generally underwritten with a view towards retention and management of credit risk associated with the Mortgage Loan.

> The SURF Underwriting Guidelines require the originator to provide to SURF an application completed by the borrower that provides information relevant to the underwriting process including information about the borrower's financial condition, the property being financed and the type of loan desired. . . .  The originator is required to provide evidence that the borrower had sufficient cash to pay the down payment, prepaid items and closing costs, along with adequate cash reserves as required by the applicable SURF loan acquisition program.

*   *   *

The SURF Underwriting Guidelines also set limits on the loan-to-value/combined loan-to-value ratios that are allowed based on income documentation type, property type, loan amount and credit grade classification. . . .

Properties securing the mortgage loans are appraised by qualified independent appraisers. The appraiser inspects and appraises the subject property and verifies that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report that presents the concise picture of the neighborhood, the property site and the improvements to the property to support an appraised value that adequately supports the estimate of market value. Each appraisal must satisfy the requirements of Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, and be on forms acceptable to Freddie Mac and Fannie Mae. The SURF Underwriting Guidelines require a review of the appraisal by a loan underwriter, who may request additional diligence. This increased diligence may include additional comparables, a field review or a second full appraisal of the property.

113.    The Merrill Lynch Mortgage Investors Trust, Series 2007-HE2 and Merrill Lynch Mortgage Investors Trust, Series 2007-SL1 Prospectus Supplements listed Ownit Mortgage Solutions Inc. as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and represented that:

Ownit (headquartered in Agoura Hills, California) was a wholesaler consumer finance company that originated non-conforming mortgage loans…. Ownit is the originator of the "RightLoan", a proprietary loan product that focuses on purchase, owner occupied, full documentation loans…. Ownit risk-based priced each loan by combining the credit score and loan-to-value price to price the loan.

The underwriting Guidelines and Credit Matrices of the RightLoan are designed to be used as a guide in determining the credit worthiness of the borrower and his/her ability to repay. The guidelines, a reasonable loan amount and the RightLoan itself offer a solution that also facilitates making logical exceptions to those guides. Exceptions to the guidelines were made if the Loan met the primary criteria of the RightLoan and offers supported compensating factors when a deviation occurred. In all cases, the exception(s) and compensating factor(s) were clearly documented in the file and required branch manager approval and a second signature from the corporate underwriter.

Using the three components, capacity, credit and collateral, the underwriter analyzed the loan profile. Capacity, which is the borrower's ability to repay, was determined by cash flow. It was required to be clearly shown that the borrower had a proven, historical cash flow, which will support the requested loan amount. . . .

Several aspects are considered in determining the borrower's capacity or ability to repay the loan. The key factors used by Ownit were employment documentation, history and amount of income used to derive debt to income ratios. . . .

A satisfactory credit history is the most reliable criterion for determining a borrower's credit worthiness. . . .

The collateral value and amount of equity in the subject property were important factors in assessing the risk of a particular loan.

114.    The Merrill Lynch Mortgage Investors Trust, Series 2007-HE2 Prospectus Supplement listed Option One Mortgage Corporation ("Option One") as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

Option One, a California corporation headquartered in Irvine, California, is the originator of certain of the Mortgage Loans…. Borrowers who qualify under Option One's underwriting guidelines generally have equity in their property and repayment ability but may have a record of major derogatory credit items such as outstanding judgments or prior bankruptcies. Option One originates mortgage loans based on its underwriting guidelines and does not determine whether such mortgage loans would be acceptable for purchase by Fannie Mae or Freddie Mac….

The Option One Mortgage Loans will have been originated generally in accordance with Option One's Non-Prime Guidelines (the "Option One Underwriting Guidelines"). The Option One Underwriting Guidelines are primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan. The Option One Mortgage Loans were also generally underwritten with a view toward resale in the secondary market.

On a case-by-case basis, exceptions to the Option One Underwriting Guidelines are made where compensating factors exist.

* * *

> Mortgage properties that are to secure mortgage loans generally are appraised by qualified independent appraisers. Such appraisers inspect and appraise the subject property and verify that such property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market value analysis based on recent sales of comparable homes in the area and, when deemed appropriate, replacement cost analysis based on current cost of constructing a similar home.
>
> All appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and are generally on forms acceptable to Fannie Mae and Freddie Mac.

115.     The Merrill Lynch Alternative Note Asset Trust, Series 2007-OAR2, Merrill Lynch Alternative Note Asset Trust, Series 2007-OAR5 and Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1 Prospectus Supplements listed Countrywide Home Loans, Inc. as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

> As part of its evaluation of potential borrowers, Countrywide Home Loans generally requires a description of income. If required by its underwriting guidelines, Countrywide Home Loans obtained employment verification providing current and historical income information and/or telephonic employment confirmation. . . .
>
> Countrywide Home Loans' underwriting standards are applied by or on behalf of Countrywide Home Loans to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Under those standards, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including principal and interest on the proposed mortgage loan and, as applicable, the related monthly portion of property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income") ratios are within acceptable limits. . . .

Countrywide Home Loans may provide secondary financing to a borrower contemporaneously with the origination of a mortgage loan, subject to the following limitations: The Loan-to-Value Ratio of the senior (i.e. first) lien may not exceed 80% and the combined Loan-to-Value Ratio may not exceed 100%.

*   *   *

In addition to Countrywide Home Loans' standard underwriting guidelines (the "Standard Underwriting Guidelines"), which are consistent in many respects with the guidelines applied to mortgage loans purchased by Fannie Mae and Freddie Mac, Countrywide Home Loans uses underwriting guidelines featuring expanded criteria (the "Expanded Underwriting Guidelines"). . . .

Countrywide Home Loans' Standard Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances up to $650,000, up to 75% for mortgage loans with original principal balances up to $1,000,000, up to 65% for mortgage loans with original principal balances of up to $1,500,000, and up to 60% for mortgage loans with original principal balances of up to $2,000,000….

Mortgage loans which are underwritten pursuant to the Expanded Underwriting Guidelines may have higher Loan-to-Value Ratios, higher loan amounts and different documentation requirements than those associated with the Standard Underwriting Guidelines. The Expanded Underwriting Guidelines also permit higher debt-to-income ratios than mortgage loans underwritten pursuant to the Standard Underwriting Guidelines.

Countrywide Home Loans' Expanded Underwriting Guidelines for mortgage loans with non-conforming original principal balances generally allow Loan-to-Value Ratios at origination of up to 95% for purchase money or rate and term refinance mortgage loans with original principal balances of up to $400,000, up to 90% for mortgage loans with original principal balances up to $650,000, up to 80% for mortgage loans with original principal balances up to $1,000,000, up to 75% for mortgage loans with original principal balances of up to $1,500,000, and up to 70% for mortgage loans with original principal balances of up to $3,000,000. Under certain circumstances, however, Countrywide Home Loans' Expanded Underwriting Guidelines allow for Loan-to-Value Ratios of up to

41

100% for purchase money mortgage loans with original principal balances of up to $375,000.

116.    The Merrill Lynch Alternative Note Asset Trust Series 2007-A2, Merrill Lynch Alternative Note Asset Trust Series 2007-A3 and Merrill Lynch Alternative Note Asset Trust, Series 2007-AF1 Prospectus Supplements listed GreenPoint Mortgage Funding, Inc. ("GreenPoint") as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

> GreenPoint has originated residential mortgage loans of substantially the same type as the Mortgage Loans since its formation in October 1999, when it acquired the assets and liabilities of Headlands Mortgage Company. . . .
>
> Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.  Exceptions to the guidelines are permitted where compensating factors are present.  The GreenPoint underwriting guidelines are generally not as strict as Fannie Mae or Freddie Mac guidelines. . . .
>
> In determining whether a prospective borrower has sufficient monthly income available to meet the borrower's monthly obligation on the proposed mortgage loan and monthly housing expenses and other financial obligations, GreenPoint generally considers the ratio of those amounts to the proposed borrower's monthly gross income.  These ratios vary depending on a number of underwriting criteria, including loan-to-value ratios ("LTV"), and are determined on a loan-by-loan basis.  The ratios generally are limited to 40% but may be extended to 50% with adequate compensating factors, such as disposable income, reserves, higher FICO credit score, or lower LTV's.  Each mortgage loan has a required amount of reserves, with the minimum being two months of principal, interest, taxes and insurance for full documentation loans.  Depending on the LTV and occupancy types, these reserve requirements may be increased to compensate for additional risk. . . .
>
> GreenPoint acquires or originates many mortgage loans under "limited documentation" or "no documentation" programs.  Under limited documentation programs, more emphasis is placed on the value and adequacy of the mortgaged property as collateral, credit history and other assets of the borrower, than on verified income of the borrower.  Mortgage loans underwritten under this type of program are generally limited to borrowers with credit histories that demonstrate an ability to repay indebtedness in a timely fashion. . . .

\* \* \*

> In determining the adequacy of the property as collateral, an independent appraisal is generally made of each property considered for financing. All appraisals are required to conform the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standard Board of the Appraisal Foundation. Each appraisal must meet the requirements of Fannie Mae and Freddie Mac. The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property is in good condition and verify that construction, if new, has been substantially completed.

117. The Merrill Lynch Alternative Note Asset Trust Series 2007-A2 and Merrill Lynch Alternative Note Asset Trust Series 2007-A3 Prospectus Supplements listed First National Bank of Nevada ("FNBN") as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

> All of the mortgage loans have been originated either under FNBN's "full" or "alternative" underwriting guidelines (i.e., the underwriting guidelines applicable to the mortgage loans typically are less stringent than the underwriting guidelines established by Fannie Mae or Freddie Mac primarily with respect to the income and/or asset documentation which borrower is required to provide). To the extent the programs reflect underwriting guidelines different from those of Fannie Mae and Freddie Mac, the performance of the mortgage loans there under may reflect relatively higher delinquency rates and/or credit losses. In addition, FNBN may make certain exceptions to the underwriting guidelines described herein if, in FNBN's discretion, compensating factors are demonstrated by a prospective borrower.

> In addition to its originations, FNBN also acquires mortgage loans from approved correspondent lenders under a program pursuant to which the correspondent agrees to originate the mortgage loans in accordance with the underwriting guidelines of FNBN…. FNBN generally conducts a quality control review of a sample of these mortgage loans within 45 [days] after the origination or purchase of such mortgage loan. The number of loans reviewed in the quality control process varies based on a variety of factors, including FNBN's prior experience with correspondent lender and the results of the quality control review process itself.

> FNBN's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed mortgaged property as collateral…. Generally, scheduled payments on a mortgage during the first year of its term plus taxes and insurance and other fixed obligations equal no more than a specified percentage of the prospective borrower's gross income. The

43

percentage applied varies on a case-by-case basis depending on a number of underwriting criteria including, but not limited to, the loan-to-value ration of the mortgage loan or the amount of liquid assets available to the borrower after origination.

The adequacy of the mortgaged property as security for repayment of the related mortgage loan will generally have been determined by an appraisal in accordance with pre-established appraisal procedure guidelines for appraisals established by or acceptable to the originator.  All appraisals conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation and must be on forms acceptable to Fannie Mae and/or Freddie Mac.

118.    The Merrill Lynch Alternative Note Asset Trust Series 2007-A2 Prospectus Supplement listed National City Mortgage Co. ("National City Mortgage") as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

National City Mortgage utilizes comprehensive, detailed policies and procedures available to all employees through the company's Intranet.  These policies and procedures consist of operations policies and procedure manuals, underwriting manuals, product guidelines, the index of credit policy statements and the company's responsible lending policy.

Corporate asset quality measures including statistical audits, target reviews, investor audits, quality and compliance reviews for branches with higher defect rates and production action plans are applied across the organization.  Additionally, each of the origination channels employs specific quality control measures to address the specific needs of the channel.  These include 100% pre-funding audits within Wholesale to check for identity theft, flipping and property valuation issues. . . .

The originator's underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value of the mortgaged property as collateral. . . .

The following underwriting guidelines apply to substantially all of the mortgage loans.  With respect to the fully documented, non-conforming purchase money or rate/term refinance loans secured by primary residences, loan-to-value ratios at origination of up to 95% for mortgage loans with original principal balances up to $500,000 are generally allowed.  In certain circumstances, 100% loan-to-value ratios are allowed for principal balances not to exceed $500,000 adhering to stricter underwriting standards. . . .

In determining whether a prospective borrower has sufficient monthly income available (i) to meet the borrower's monthly obligation on their proposed mortgage loan and (ii) to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, the originator generally considers, when

required by the applicable documentation program, the ration of such amounts to the proposed borrower's acceptable stable monthly gross income. . . .

Each mortgage property securing a Mortgage Loan has been appraised by a qualified independent appraiser.  All appraisals are required to conform to the Uniform Standards of Professional Appraisals Practice adopted by the Appraisal Standard Board of Appraisal Foundation.  Each appraisal must meet the requirements of Fannie Mae and Freddie Mac.  The requirements of Fannie Mae and Freddie Mac require, among other things, that the appraiser, or its agent on its behalf, personally inspect the property inside and out, verify whether the property was in good condition, and verify that construction, if new, had been substantially completed.

119.   The Merrill Lynch Alternative Note Asset Trust Series 2007-AF1 Prospectus Supplement listed American Home Mortgage Corp. ("American Home") as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

The ["conforming or "prime"] mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginne Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines of the Originator.

The Originator's non-conforming underwriting guidelines are similar to those of the government sponsored enterprises Fannie Mae and Freddie Mac, but these loans are "non-conforming" in that the may not conform to the maximum loan amounts and in some cases underwriting guidelines of Fannie Mae and Freddie Mac.  These non-conforming loans do not conform to and are not insurable by the Federal Housing Administration nor can they be guaranteed by the U.S. Department of Veterans Affairs.

The Originator's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.

Every mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisals Practice adopted by the Appraisal Standard Board of Appraisal Foundation.    The appraisers perform on-site inspections of the property and report on the neighborhood and property condition in factual and specific terms.  Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties and a logical analysis with adjustments for differences between the comparable sales and the

subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by the Originator's vendor management company or an underwriter of the Originator or a mortgage insurance company contract underwriter.

The appraiser's value conclusion is used to calculate the ration (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property, this ratio is based on the lower of the sales price of the property and the appraised value. The Originator sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan.

120.    The Merrill Lynch Alternative Note Asset Trust Series 2007-OAR2 and Merrill Lynch Alternative Note Asset Trust, Series 2007-OAR4 Prospectus Supplements listed IndyMac Bank F.S.B. ("IndyMac Bank") as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines, which also accept mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of whether such mortgage loans would otherwise meet IndyMac Bank's guidelines, or pursuant to an exception to those guidelines based on IndyMac Bank's procedures for approving such exceptions. . . .

IndyMac Bank's underwriting criteria for traditionally underwritten mortgage loans includes an analysis of the borrower's credit history, ability to repay the mortgage loan and the adequacy of the mortgaged property as collateral. Traditional underwriting decisions are made by individuals authorized to consider compensating factors that would allow mortgage loans not otherwise meeting IndyMac Bank's guidelines. . . .

To determine the adequacy of the property to be used as collateral, an appraisal is generally made of the subject property in accordance with the Uniform Standards of Professional Appraisals Practice. The appraiser generally inspects the property, analyzes data including the sales price of comparable properties and issues an opinion of value using Fannie Mae/Freddie Mac appraisal report form, or other acceptable form.

121.    The Merrill Lynch Mortgage Investors Trust, Series 2007-HE3 Prospectus Supplement listed First NLC as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

First NLC's underwriting guidelines are designed to evaluate a borrower's credit history, his or her capacity, willingness and ability to repay the loan, and the value and adequacy of the

collateral.... Each borrower must complete a mortgage loan application that includes information with respect to the applicant's liabilities, income, credit history, employment history and other personal information.

Appraisals are performed by licensed, third-party, fee-based appraisers who are hired by First NLC or the broker and include, among other things, an inspection of the exterior and interior of the subject property.... First NLC requires its underwriters to review all third-party appraisals against an appraisal checklist of qualitative standards, such as square footage, zoning status, comparable property information and improvements. If the underwriters are not satisfied with the accuracy of the third-party appraisals, they will request that a senior credit officer review the appraisal.

First NLC may make exceptions and upgrades to its underwriting guidelines on a case-by-case basis where compensating factors exist . . . .

In addition to the above referenced file review, First NLC employees [sic] a traditional independent quality control review, a random sample of 5 to 10% of its production. These loans are re-verified for accuracy of income, assets, and adherence to underwriting and appraisal guidelines. Monthly findings are provided to the Operations Managers and Assistant Chief Credit Officers in each center as well as senior management. Any significant findings are quickly addressed and appropriate actions are taken.

122. The Merrill Lynch Mortgage Investors Trust Series 2007-MLN1 Prospectus Supplement listed Mortgage Lending Network USA, Inc. ("MLN") as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

The following describes MLN and its Underwriting Guidelines as of and during the period which the Mortgage Loans were originated. All Mortgage Loans were underwritten in accordance with the Underwriting Policies and Procedures in effect at MLN at the time of origination. The Underwriting Policies and Procedures and applicable Guidelines were used by MLN to evaluate the creditworthiness of the borrower, appraise the adequacy of collateral and to assess the ability of the borrower to repay the Mortgage Loan. The Mortgage loans were not underwritten to any standard other than the underwriting standards then in place at MLN at the time of origination; however, each Mortgage Loan was underwritten to be eligible to be sold in the secondary market. From time to time, on a loan-by-loan basis, exceptions may have been made to the Underwriting Guidelines.

General Provisions: … The consumer's ability to pay is of primary importance when evaluating applications. Collateral must exhibit pride of ownership. Credit grade decisions are based on a

combination of credit score and the applicant's established history of repayment. MLN does not make credit grade exceptions or upgrades. MLN is not a 'hard equity' lender. While the LTV does play a part in the decision-making process, the applicant must exhibit the required capacity and credit depth in order to qualify for approval.

For Quality Control Policies and Procedures, MLN reviewed 10% of the mortgage loans originated in any given month.

123. The Merrill Lynch Alternative Note Asset Trust Series 2007-OAR3 Prospectus Supplement listed Paul Financial LLC ("Paul Financial") as a loan originator accounting for the loans in the mortgage pool underlying that Issuing Trust, and stated that:

Paul Financial's underwriting standards are applied by or on behalf of Paul Financial to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Except under the No Income programs, a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses (including interest on the proposed mortgage loan and, as applicable, the related monthly portion of the property taxes, hazard insurance and mortgage insurance) to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the "debt-to-income" ratios) are within acceptable limits.

Paul Financial obtains appraisals from independent appraisers or appraisal services for properties that are to secure mortgage loans. The appraisers inspect and appraise the proposed mortgaged property and verify that the property is in acceptable condition. Following each appraisal, the appraiser prepares a report which includes a market data analysis based on recent sales of comparable homes in the area and, when deemed appropriate, a replacement cost analysis based on the current cost of constructing a similar home. All appraisals are required to conform to Fannie Mae or Freddie Mac appraisal standards then in effect.

124. The above statements, as set forth in ¶¶109-123, were materially false and misleading when made because they failed to disclose (i) that First Franklin, MLML and the other loan originators systematically ignored, or were forced by Merrill Lynch to abandon their stated and traditional underwriting standards during the period of origination; (ii) that the underwriting standards actually utilized did not properly evaluate the borrower's credit standing and ability to repay the loan, as represented; (iii) exceptions were made to the underwriting

standards despite the absence of true compensating factors; and (iv) that the appraisals were not conducted in accordance with the loan originators' stated underwriting standards.

125.    The Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-3 and Merrill Lynch First Franklin Mortgage Loan Trust, Series 2007-4 Prospectus Supplements, as well as the Prospectus Supplements of the Issuing Trust for which First Franklin was the Sponsor, stated that the loans underlying the Certificates of the Issuing Trusts were originated or acquired from third parties by First Franklin, and stated:

> First Franklin Financial's acquisition underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgage property as collateral for the mortgage loan. The standards established by First Franklin Financial require that the mortgage loans of a type similar to the Mortgage Loans were underwritten by the third party originators with a view toward the resale of the mortgage loans in the secondary mortgage market. In accordance with First Franklin Financial's guidelines for acquisition, the third party originators must consider, among other things, a mortgagor's credit history, repayment ability and debt service to income ratio. ("Debt Ratio"), as well as the value, type and use of the mortgaged property.

> *   *   *

> The third party originators are required to conduct a number of quality control procedures, including a post funding compliance audit as well as a full re-underwriting of a random selection of loans to assure asset quality. Under the asset quality audit, all loans are required to be reviewed to verify credit grading, documentation compliance and data accuracy. Under the asset quality procedure, a random selection of each month's originations must be reviewed by each third party originator.

> The loan review is required to confirm the existence and accuracy of credit documentation, appraisal analysis and underwriting decision. A report detailing audit findings and level of error is sent monthly to each branch for response. The audit findings must then be reviewed by the third party originator's senior management. Adverse findings are to be tracked monthly and over a rolling six month period. This review procedure allows the third party originator to assess the programs for potential guideline changes,

49

program enhancements, appraisal policies, areas of risk to be reduced or eliminated and the need for additional staffing.

Under the mortgage loan programs, various risk categories are used to grade the likelihood that the applicant will satisfy the repayment conditions of the loan.

126.    For the Issuing Trusts where MLML served as the Sponsor/Seller, the Prospectus Supplements stated:

Prior to acquiring any residential mortgages, MLML conducts a review of the related mortgage loan seller that is based upon the credit quality of the selling institution.  MLML's review process may include reviewing select financial information for credit and risk assessment and conducting an underwriting guideline review, senior level management discussion and/or background checks. The scope of the mortgage loan due diligence varies based on the credit quality of the mortgage loans.

The underwriting guideline review entails a review of the mortgage loan origination process and systems.  In addition, such review may involve consideration of corporate policy and procedures relating to state and federal predatory lending, origination practices by jurisdiction, historical loan level loss experience, quality control practices, significant litigation and/or material investors.

127.    The above statements, as set forth in ¶¶125-126, were materially false and misleading when made because they failed to disclose that First Franklin and the other third party loan originators: (i) systematically ignored, or were coerced by Merrill Lynch to abandon their stated and traditional underwriting standards and that the underwriting standards actually utilized failed to conform to First Franklin's acquisition underwriting standards; and (ii) abandoned their respective corporate policy and procedures relating to origination and quality control practices so that they could increase their loan origination quantity and the resulting fees obtained.

128.    The Registration Statements and Prospectuses stated that only "[i]f specified in the related Prospectus Supplement, the Loan-to-Value Ratio of certain Mortgage Loans may exceed 100%."  Accordingly, each Prospectus Supplement included tabular data reflecting the "Range of Combined Loan-to-Value Ratios" indicating the number of loans per each range of

Loan-to-Value Ratios, and the weighted average Combined Loan-to-Value Ratio for the mortgage loans. For example, the MLFFML Trust Series 2007-A Prospectus Supplement indicated that 4,714 loans (out of 5,004 total loans) were within the Loan-to-Value Ratio range of 95.01% to 100%. The weighted average Loan-to-Value ratio was represented as 99.54%. No loan was represented to have a Loan-to-Value Ratio of greater than 100%.

129. The above statements, including the tabular statistics in each Prospectus Supplement regarding the purported Loan-to-Value Ratios of the underlying mortgages, were materially false and misleading when made because they failed to disclose that the Loan-to-Value Ratios would have been higher if the underlying properties were appraised according to pre-established, independent appraisal procedures and in accordance with USPAP, as stated in the Prospectus Supplements. In addition, the statements were materially false and misleading when made because the actual Loan-to-Value Ratio for a number of mortgage loans would have exceeded 100% if the underlying properties were appraised according to pre-established independent appraisal procedures and in accordance with USPAP, per the appraisal guidelines set forth in the Prospectus Supplements.

130. The Prospectuses represented that the securitization structure of each of the Certificate offerings was structured to include credit enhancement in the form of overcollateralization. Each Prospectus Supplement stated a particular amount by which the aggregate stated principal balance of the mortgage loans was greater than the aggregate class principal of the Certificates at the time of the offering. For example, the MLFFML Trust Series 2007-A Prospectus Supplement stated:

> The overcollateralization amount is the excess of the aggregate outstanding principal balance of the mortgage loans over the aggregate principal balance of the offered [C]ertificates and class B-4 certificates. On the closing date, the overcollateralization amount will equal approximately 19.65% of the aggregate outstanding principal balance of the mortgage loans as of the cut-off date.

131.    The Prospectuses and Prospectus Supplements stated, "Generally, because more interest is required to be paid by the mortgagors than is necessary to pay the interest accrued on the [C]ertificates and the expenses of the issuing entity, there is expected to be excess interest each month.  On each distribution date, subject to limited exceptions described herein, the issuing entity will apply some or all of the excess interest as a principal payment on the most senior classes of [C]ertificates then outstanding until the overcollateralization target is reached…."

132.    The above statements were materially false and misleading when made because they failed to disclose that because MLML, First Franklin and the other loan originators systematically ignored, or were forced by Merrill Lynch to abandon their underwriting standards, and abandoned their property appraisal standards, borrowers would not be able to repay their loans, foreclosure sales would not recoup the full value of the loans, and the aggregate expected principal payments would not, nor could they be expected to, exceed the aggregate class principal of the Certificates. As such, the Certificates were not protected with the level of credit enhancement and overcollateralization represented to investors in the Prospectus Supplements.

133.    The Registration Statements and Prospectuses stated that it was "a condition of the issuance of the Offered Certificates that they be assigned" certain pre-determined ratings from the Rating Agency Underwriters, as set forth in the Prospectus Supplements.  As stated:

> Moody's ratings on mortgage pass-through certificates address the likelihood of the receipt by certificate holders of all distributions to which such certificateholders are entitled.  Moody's ratings opinions address the structural and legal issues associated with the Offered Certificates, including the nature of the underlying Mortgage Loans.
>
> S&P ratings on mortgage pass-through certificates address the likelihood of receipt by certificateholders of payments required under the operative agreements.  S&P's ratings take into consideration the credit quality of the mortgage pool including credit support providers, structural and legal aspects associated with the certificates, and the extent to which the payment stream of

the mortgage pool is adequate to make payments required under
the certificates.

134.    Each Prospectus Supplement listed the initial Ratings of the Certificates being
offered by the Issuing Trust.  In each, certain Certificates were rated as investment-grade, in
accordance with the pre-established rating systems utilized by the Rating Agency Underwriters.
For example, the MLFFML Trust, Series 2007-A Prospectus Supplement included the
following chart identifying each Series 2007-A Certificate rating:

**Ratings**

It is a condition of the issuance of the Offered Certificates that they be assigned the ratings
designated below by each of Moody's and S&P.

| Class of Certificates | Moody's | S&P |
|---|---|---|
| A-1 | Aaa | AAA |
| A-2 | Aaa | AAA |
| A-3 | Aaa | AAA |
| M-1 | Aa1 | AA+ |
| M-2 | Aa2 | AA |
| M-3 | Aa3 | AA- |
| M-4 | A1 | A+ |

| Class of Certificates | Moody's | S&P |
|---|---|---|
| M-5 | A2 | A |
| M-6 | A3 | A- |
| B-1 | Baa1 | BBB+ |
| B-2 | Baa2 | BBB |
| B-3 | Baa3 | BBB- |
| R | NR | AAA |

135.    The above statements, as set forth in ¶¶133 and 134, were false and misleading
when made because they (i) failed to disclose that the ratings assigned to the Certificates did not
reflect the true likelihood of the receipt of all payments on the loans; (ii) misrepresented that the
ratings considered the actual credit quality of the loans; (iii) misrepresented that the ratings
considered the extent to which the payment stream on the loans was adequate to make the
payments required by the Certificates; and (iv) misrepresented that certain Certificates were
"investment-grade" when they should have been classified as below investment-grade, in
accordance with the Rating Agency Underwriters' pre-established rating guidelines.

## VIII.    CLASS ACTION ALLEGATIONS

136.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil
Procedure 23(a) and (b)(3), individually and on behalf of itself and all persons or entities

("plaintiffs" or the "Class") who purchased or otherwise acquired beneficial interests in the assets of the Merrill Lynch Issuing Trusts (as set forth in ¶¶30-31) pursuant to or traceable to Merrill Lynch Mortgage Investors, Inc.'s February 2, 2007 Registration Statement and/or Merrill Lynch Mortgage Investors, Inc.'s December 2005 Registration Statement and accompanying Prospectuses and Prospectus Supplements.

137.   This action is properly maintainable as a class action for the following reasons:

a)   The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through discovery, plaintiffs believe that there are thousands of members of the proposed Class, who may be identified from records maintained by the Issuing Defendants and/or may be notified of this action using the form of notice customarily used in securities class actions.

b)   Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is adequately representative of the Class and will fairly and adequately protect the interests of the Class.

c)   The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

d)   A class action is superior to all other methods for a fair and efficient adjudication of this controversy. There will be no difficulty in the management of this action

as a class action.  Furthermore, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

138.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

a)    Whether defendants violated the Securities Act;

b)    Whether statements made by defendants to the investing public in the Registration Statements, Prospectuses and Prospectus Supplements both omitted and misrepresented material facts about the mortgages underlying the Issuing Trusts; and

c)    The extent and proper measure of the damages sustained by the members of the Class.

<u>FIRST CAUSE OF ACTION</u>

<u>For Violation of Section 11 of the Securities Act</u>
(Against The Individual Defendants, Issuing Defendants and Underwriter Defendants)

139.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

140.    This Cause of Action is brought pursuant to Section 11 of the Securities Act, on behalf of Plaintiff and the Class, against the Individual Defendants, the Issuing Defendants and the Underwriter Defendants.  This Cause of Action is predicated upon defendants' strict liability for making false and misleading statements in the Offering Documents.

141.    The Registration Statements for the Certificate offerings were materially misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

142.    The Individual Defendants, the Issuing Defendants and the Underwriter Defendants are strictly liable to Plaintiff and the Class for making the misstatements and omissions in issuing the Certificates.

143.    The Individual Defendants each signed the Registration Statements.

144.    The Underwriter Defendants each acted as an underwriter in the sale of Certificates issued by the Issuing Trusts, directly and indirectly participated in the distribution of the Certificates, and directly and indirectly participated in drafting and disseminating the Offering Documents for the Certificates.  The Underwriter Defendants were underwriters for the respective Issuing Trusts.

145.    The Individual Defendants, Issuing Defendants and Underwriter Defendants owed to the Plaintiff and other Class members the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

146.    The Individual Defendants, Issuing Defendants and Underwriter Defendants knew, or in the exercise of reasonable care should have known, of the material misstatements and omissions contained in or omitted from the Offering Documents as set forth herein.

147.    Each of the Individual Defendants, Issuing Defendants and Underwriter Defendants failed to possess a reasonable basis for believing, and failed to make a reasonable investigation to ensure, that statements contained in the Offering Documents were true and/or that there was no omission of material facts necessary to make the statements contained therein not misleading.

148.    The Individual Defendants, Issuing Defendants and Underwriter Defendants issued and disseminated, caused to be issued or disseminated, and participated in the issuance and dissemination of material statements to the investing public which were contained in the

Prospectuses, which made false and misleading statements and/or misrepresented or failed to disclose material facts, as set forth above.

149.    By reason of the conduct alleged herein, each of the Individual Defendants, Issuing Defendants and Underwriter Defendants violated Section 11 of the Securities Act, and is liable to Plaintiff and the Class.

150.    Plaintiff and other Class members acquired Certificates pursuant and/or traceable to the Registration Statements.  At the time Plaintiff and Class members obtained their Certificates, they did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

151.    Plaintiff and other Class members have sustained damages as a result of the wrongful conduct alleged and the violations of the Individual Defendants, Issuing Defendants and Underwriter Defendants.

152.    By virtue of the foregoing, Plaintiff and other Class members are entitled to damages, jointly and severally from each of the Individual Defendants, Issuing Defendants and Underwriter Defendants, as set forth in Section 11 of the Securities Act.

153.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Offering Documents and within three years of the Certificates being offered to the public.  Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

SECOND CAUSE OF ACTION

For Violation of Section 12(a)(2) of the Securities Act
(Against the Issuing Defendants and Underwriter Defendants)

154.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

155.     This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, on behalf of Plaintiff and the Class, against the Issuing Defendants and Underwriter Defendants.

156.     The Issuing Defendants and Underwriter Defendants promoted and sold Certificates pursuant to the defective Prospectuses for their own financial gain.  The Prospectuses contained untrue statements of material fact, omitted to state facts necessary to make statements not misleading, and concealed and failed to disclose material facts.

157.     The Issuing Defendants and Underwriter Defendants owed to Plaintiff and the other Class members who purchased Certificates pursuant to the Prospectuses a duty to make a reasonable and diligent investigation of the statements contained in the Prospectuses, to ensure that such statements were true and that there was no omission of material fact necessary to make the statements contained therein not misleading.  The Issuing Defendants and Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectuses, as set forth herein.

158.     Plaintiff and other Class members purchased or otherwise acquired Certificates pursuant to and/or traceable to the defective Prospectuses.  Plaintiffs did not know, and in the exercise of reasonable diligence could not have known, of the misrepresentations and omissions contained in the Prospectuses.

159.     By reason of the conduct alleged herein, the Issuing Defendants and Underwriter Defendants violated Section 12(a)(2) of the Securities Act, and are liable to Plaintiff and other Class members who purchased Certificates pursuant to and/or traceable to the Prospectuses.

160.     Plaintiff and other Class members were damaged by the Issuing Defendants' and Underwriter Defendants' wrongful conduct.  Those Class members who have retained their Certificates have the right to rescind and recover the consideration paid for their Certificates, as set forth in Section 12(a)(2) of the Securities Act.  Those Class members who have sold their Certificates are entitled to rescissory damages, as set forth in Section 12(a)(2) of the Securities Act.  These plaintiffs hereby tender their Certificates, or proceeds from the sale thereof, to

defendants named in this Cause of Action in exchange for the value of the consideration paid for such Certificates, plus interest. In the alternative, these plaintiffs seek recovery of damages in an amount to be proven at trial.

161.    This action is brought within one year after the discovery of the untrue statements and omissions contained in the Prospectuses and within three years of when the Certificates were sold to the public. Despite the exercise of reasonable diligence, Plaintiff could not have reasonably discovered the untrue statements and omissions in the Offering Documents at an earlier time.

THIRD CAUSE OF ACTION

For Violation of Section 15 of the Securities Act
(Against Merrill Lynch, MLML, First Franklin and MLPFS)

162.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein, to the extent that such allegations do not sound in fraud.

163.    This Cause of Action is brought against defendants Merrill Lynch, MLML, First Franklin and MLPFS as controlling persons, pursuant to Section 15 of the Securities Act. Each of Merrill Lynch, MLML, First Franklin and MLPFS, by virtue of its control, ownership, offices, directorship, and specific acts, was at the time of the wrongs alleged herein a controlling person of the Issuing Defendants within the meaning of Section 15 of the Securities Act. Each of Merrill Lynch, MLML, First Franklin and MLPFS had the power and influence, and exercised that power and influence, to cause the Issuing Defendants to engage in violations of the Securities Act, as described herein.

164.    Merrill Lynch's, MLML's, First Franklin's and MLPFS's control ownership and position made them privy to, and provided them with actual knowledge of, the material facts concealed from Plaintiff and other Class members.

165.    By virtue of the wrongful conduct alleged herein, Merrill Lynch, MLML, First Franklin and MLPFS are liable to Plaintiff and other Class members for their sustained damages.

59

<u>RELIEF REQUESTED</u>

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

(a)    Declaring this action properly maintainable as a class action and certifying Plaintiff as Class representative;

(b)    Awarding compensatory and/or rescissionary damages in favor of Plaintiff and other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other relief as the Court may deem just and proper.

<u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all claims so triable.

Dated: February 17, 2009

BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP


Chad Johnson
_____
CHAD JOHNSON (CJ-3395)
1285 Avenue of the Americas, 38th Floor
New York, NY 10019
Tel:    (212) 554-1400
Fax:    (212) 554-1444
chad@blbglaw.com
          -and-
DAVID R. STICKNEY
TIMOTHY A. DeLANGE
DAVID A. THORPE
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 793-0070
Fax:    (858) 793-0323
davids@blbglaw.com
timothyd@blbglaw.com
davidt@blbglaw.com

POND, GADOW & TYLER, P.A.
JOHN GADOW
BLAKE TYLER
502 South President Street
Jackson, MS 39201
johngadow@pgtlaw.com
btyler@pgtlaw.com

*Counsel for Plaintiff Public Employees'
Retirement System of Mississippi and Proposed
Lead Counsel for the Class*

# EXHIBIT 1

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, George W. Neville, Esq., on behalf of the Public Employees' Retirement System of Mississippi ("Mississippi PERS"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.    I am a Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi.  I have reviewed the complaint and authorized its filing by Bernstein Litowitz Berger & Grossmann LLP.

2.    Mississippi PERS did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.    Mississippi PERS is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.    Mississippi PERS' transactions in the Merrill Lynch pass-through securities that are the subject of this action are set forth in the chart attached hereto.

5.    Mississippi PERS has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Sears Holdings Corporation Securities Litigation*, Case No. 06-cv-4053 (S.D.N.Y.)
*In re Semtech Corp. Securities Litigation*, Case No. 07-cv-7114 (C.D. Cal.)
*In re Ambac Financial Group, Inc. Securities Litigation*, Case No. 08-cv-411 (S.D.N.Y)
*In re Schering-Plough Corporation/Enhance Securities Litigation*, Case No. 08-cv-397 (D.N.J.)
*In re Maxim Integrated Products Inc. Securities Litigation*, Case No. 08-cv-832 (N.D. Cal.)

6.    Mississippi PERS has sought to serve as a representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*Public Employees' Retirement System of Mississippi v. Morgan Stanley et al.,*
Case No. 08-cv-1469 (C.D. Cal.)
*Public Employees' Retirement System of Mississippi v. Goldman Sachs Group, Inc. et al.,*
Case No. 09-cv-1110 (S.D.N.Y.)

7.    Mississippi PERS is serving as a lead plaintiff and representative party on behalf of a class in *In re Merck & Co. Inc. Securities, Derivative & "ERISA" Litigation*, MDL No. 1658 (SRC); 05-cv-01151 (D.N.J.), 05-cv-2367 (D.N.J.).  Mississippi PERS intervened in the action and was appointed to serve as a lead plaintiff and representative party in the action in 2007.

8.     Mississippi PERS has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff or was not appointed lead plaintiff:

*In re Par Pharmaceutical Companies, Inc. Securities Litigation*, Case No. 06-cv-3226 (D.N.J.)
*In re Dell, Inc. Securities Litigation*, Case No. 06-cv-726 (W.D. Tex.)
*Freudenberg v. E*Trade Financial Corporation, et al.*, Case No. 07-cv-8538 (S.D.N.Y.)
*Lipetz et al. v. Wachovia Corporation et al.*, Case No. 08-cv-6171 (S.D.N.Y.)

9.     Mississippi PERS will not accept any payment for serving as a representative party on behalf of the Class beyond Mississippi PERS' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of February, 2009.

George W. Neville
Special Assistant Attorney General
*Legal Counsel to the Public Employees' Retirement System of Mississippi*

**Mississippi PERS**

**Transactions in Merrill Lynch Mortgage Investors Trust Series MLCC 2006-2**

| CUSIP # | Transaction | Date | Face Amount | Price |
|---|---|---|---|---|
| 590219AG6 | Purchase | 9/6/2006 | 13,000,000 | $92.6539 |
| 590219AG6 | Sale | 7/30/2008 | (13,000,000) | $65.5998 |

**Transactions in Merrill Lynch Alternative Note Asset Trust Series 2007-F1**

| CUSIP # | Transaction | Date | Face Amount | Price |
|---|---|---|---|---|
| 59023YAB0 | Purchase | 3/29/2007 | 4,000,000 | $100.3430 |
| 59023YAB0 | Sale | 9/29/2008 | (4,000,000) | $68.3750 |

**Transactions in Merrill Lynch First Franklin Mortgage Loan Trust Series 2007-A**

| CUSIP # | Transaction | Date | Face Amount | Price |
|---|---|---|---|---|
| 59025QAA7 | Purchase | 8/30/2007 | 775,000 | $99.8820 |